# Letter of Opinion

# Subject:  Sonji Renae McKinney

# May 27, 2025

# Sharon Ottinger

Court-Qualified, Expert Document Examiner
P.O. Box 241, Seabrook, TX 77586 ~ 713-859-6882
123Forgery.com - 123Forgery@gmail.com

---

Document Examiner Letter of Opinion
## Subject: Sonji Renae McKinney
May 27, 2025

## REQUEST

I was asked to examine one signature, purportedly signed by Sonji Renae McKinney, on a document entitled PRISMA HEALTH – INFORMED CONSENT FOR ANESTHESIA – Greenville Memorial Medical Center, dated March 12, 2023.

I was also asked to examine one set of initials, purportedly signed by Sonji Renae McKinney, on a document entitled PRISMA HEALTH – INFORMED CONSENT FOR OPERATION AND/OR PROCEDURE – Greenville Memorial Hospital, dated March 11, 2023.

The purpose of these examinations was to determine if the Questioned signature and the Questioned set of initials were authored by Sonji Renae McKinney.

## EXAMINATIONS

The Questioned signature on the document has been labeled Exhibit Q1 and the Questioned set of initials has been labeled Exhibit QI1. I also received seventeen (17) Known signatures of Sonji Renae McKinney and seven (7) Known sets of initials of Sonji Renae McKinney. The Known signatures have been labeled Exhibit K1-K17, and the Known sets of initials have been labeled Exhibits KI-K7.

NOTE: (Q = Questioned Signature) (K = Known Signature)

## COMPARISONS

The identification of any signature/handwriting is based on the agreement, without unexplained differences, of the handwriting characteristics displayed. These characteristics include the form of the letters, the beginning, connecting, and ending strokes, the proportions of letters, the size and curvature of the writing/printing, the spacing and arrangement of the letters, and the skill of the writer. The alignment, positioning, and outstanding significant features are other factors used to analyze, compare, and evaluate handwriting. The elimination or identification of an author is based on a lack of or a preponderance of some or all of the above-noted characteristics.

The Questioned signature of Sonji Renae McKinney, labeled Exhibit Q1, and the Questioned set of initials labeled QI1, in addition to the seventeen (17) Known signatures of Sonji Renae McKinney and the seven Known sets of initials, were enlarged. A meticulous examination was conducted using a side-by-side comparison with the unaided eye and photocopy enlargements.

1

## TRAINING

I have studied and been trained in the examination, comparison, analysis, and identification of handwriting, in addition to examining signatures, altered numerals, and altered documents. I have approximately 20 years of experience in this field, and a true and correct copy of my Curriculum Vitae is attached as *Exhibit 1*.

## METHODOLOGY

The scientific methodology used in this examination was the standard operating procedures set forth by SWGDOC and the American Academy of Forensic Science. The American Board of Forensic Document Examiners adopted these guidelines in reports and testimony. The **S**cientific **W**orking **G**roup for **D**ocument **E**xaminers recommends this method as the standard in this field. The *SWGDOC Standard for Examination of Handwritten Items* is attached as *Exhibit 2*, and the *SWGDOC Standard Terminology for Expressing Conclusions of Forensic Document Examiners* is attached as *Exhibit 3*.

## HYPOTHESIS

My hypothesis regarding the authorship and authenticity of the one (1) Questioned signature and one Questioned set of initials of Sonji Renae McKinney labeled Exhibits Q1 and QI1 on the document entitled PRISMA HEALTH – INFORMED CONSENT FOR ANESTHESIA – Greenville Memorial Medical Center, dated March 12, 2023, was formed without bias.

My examination revealed significant differences when comparing the Questioned signature to the Known signatures. Additionally, my conclusion was logical and based on the previously described methodology, analysis, comparison, and evaluation results. All tests were done with accepted scientific methodology and techniques, which were used to form my opinion.

## BASIS

The basis of handwriting identification is that writing habits are not instinctive or hereditary but are complex processes developed gradually through habit, and also that handwriting is unique to each individual. Further, the basic axiom is that no one person writes exactly the same way twice (or signs their name exactly the same way twice), and no two people write exactly the same. Thus, writing habits or individual characteristics distinguish one person's handwriting from another.

Roy A. Huber and A.M. Headrick, leading forefathers of document examination in the USA, agree that one significant (unexplainable) difference in the fundamental structure of handwriting compared to another is enough to preclude common authorship.

Ordway Hilton stated: "It is the basic axiom of identification in document problems that a limited number of basic differences, even in the face of numerous strong similarities, are controlling and accurately establish nonidentity."

Wilson R. Harrison made similar comments: "…the fundamental rule which admits of no exception when handwritings are being compared…is simple – whatever features two specimens of handwriting may have in common, they cannot be considered to be of common authorship if they

2

display but a single consistent dissimilarity in any feature which is fundamental to the structure of the handwriting, and whose presence is not capable of reasonable explanation."

James V.P. Conway expressed the same theme when he wrote: "A series of fundamental agreements in identifying individualities is requisite to the conclusion that two writings were authored by the same person, whereas a single fundamental difference in an identifying individuality between two writings precludes the conclusion that they were executed by the same person", and finally,

Albert S. Osborn and others have generally agreed that, despite numerous similarities in two sets of writings, a conclusion of identity cannot be made if there are one or more differences in fundamental features of the writings.

## **CONCLUSION**

Based upon a thorough analysis of these items and from an application of accepted forensic document examination tools, principles, and techniques, it is my professional expert opinion that the Questioned signature labeled Exhibit Q1 on a document entitled PRISMA HEALTH – INFORMED CONSENT FOR ANESTHESIA – Greenville Memorial Medical Center, dated March 12, 2023, and the Questioned set of initials labeled Exhibit QI1 on a document entitled PRISMA HEALTH – INFORMED CONSENT FOR OPERATION AND/OR PROCEDURE – Greenville Memorial Hospital, dated March 11, 2023, purportedly signed by Sonji Renae McKinney, when compared to the Known signatures labeled Exhibit K1-K17 and the Known sets of initials of Sonji Renae McKinney, labeled Exhibit K1-K7, has resulted in this document examiner's opinion that Sonji Renae McKinney **DID NOT** author the Questioned signature labeled Exhibit Q1 or the set of initials labeled Exhibit QI1.

I am willing to testify to this fact in a court of law and will provide the Court with exhibits showing I had sufficient data to prove my professional expert opinion is correct.

Respectfully submitted,

_____

Sharon Ottinger

The above Document Examiner Letter of Opinion (Subject: Sonji Renae McKinney) was sworn and subscribed before me by Sharon Ottinger this _____ day of _____, 2025.

| | |
|---|---|
| State of Texas | § |
| County of Harris | § |
| | §_____ |
| | Notary Seal |

3

display but a single consistent dissimilarity in any feature which is fundamental to the structure of the handwriting, and whose presence is not capable of reasonable explanation."

James V.P. Conway expressed the same theme when he wrote: "A series of fundamental agreements in identifying individualities is requisite to the conclusion that two writings were authored by the same person, whereas a single fundamental difference in an identifying individuality between two writings precludes the conclusion that they were executed by the same person", and finally,

Albert S. Osborn and others have generally agreed that, despite numerous similarities in two sets of writings, a conclusion of identity cannot be made if there are one or more differences in fundamental features of the writings.

## CONCLUSION

Based upon a thorough analysis of these items and from an application of accepted forensic document examination tools, principles, and techniques, it is my professional expert opinion that the Questioned signature labeled Exhibit Q1 on a document entitled PRISMA HEALTH – INFORMED CONSENT FOR ANESTHESIA – Greenville Memorial Medical Center, dated March 12, 2023, and the Questioned set of initials labeled Exhibit Q11 on a document entitled PRISMA HEALTH – INFORMED CONSENT FOR OPERATION AND/OR PROCEDURE – Greenville Memorial Hospital, dated March 11, 2023, purportedly signed by Sonji Renae McKinney, when compared to the Known signatures labeled Exhibit K1-K17 and the Known sets of initials of Sonji Renae McKinney, labeled Exhibit K1-K7, has resulted in this document examiner's opinion that Sonji Renae McKinney **DID NOT** author the Questioned signature labeled Exhibit Q1 or the set of initials labeled Exhibit Q11.

I am willing to testify to this fact in a court of law and will provide the Court with exhibits showing I had sufficient data to prove my professional expert opinion is correct.

Respectfully submitted,

Sharon Ottinger

The above Document Examiner Letter of Opinion (Subject: Sonji Renae McKinney) was sworn and subscribed before me by Sharon Ottinger this _2nd_ day of _May_, 2025.

State of Texas   §
County of Harris   §
             § _____
                       Notary Seal

OLIVIA de JESUS
NOTARY PUBLIC, STATE OF TEXAS
Notary ID #13379394-7
Expires June 02, 2026

3

Subject: Sonji Renae McKinney

# **Questioned Document**

**PRISMA HEALTH.**

GMH NEURO MED SURG
701 Grove Road
Greenville SC 29605

McKinney, Sonji Renae
MRN: 970752451, DOB: 3/14/1975, Sex: F
Adm: 3/10/2023, D/C: 3/15/2023

03/10/2023 - ED to Hosp-Admission (Discharged) in Greenville Memorial Neuroscience Med Surg (continued)

**Documents**

Consent - Anesthesia - Scan on 3/10/2023

Scan (below)

MCKINNEY, SONJI RENAE 03/14/1975 970752451

---

**PRISMA HEALTH.**  Consent Anesthesia
Prisma Health-Upstate

McKINNEY, SONJI RENAE
DOB: 3/14/1975
MRN: 970752451
ISAR: 800055747015
Adm Date: 3/10/2023 

**INFORMED CONSENT FOR ANESTHESIA**

☒ Greenville Memorial Medical Center
☐ Cross Creek Surgery Center
☐ Patewood Memorial Hospital
☐ North Greenville Hospital
☐ Surgery Center - Spartanburg
☐ OTHER (Specify)_____

☐ Patewood Outpatient Center
☐ Greer Memorial Hospital
☐ Hillcrest Memorial Hospital
☐ Laurens County Memorial Hospital
☐ Oconee Memorial Hospital

**ANESTHESIA (To be completed after Anesthesiologist has discussed with patient/representative)**
An Anesthesiologist has explained to me that anesthesia services may be needed so that my physician can perform the operation(s) or procedure(s). I understand that anesthesia will be provided by one or more Anesthesiologists (a physician), or Certified Registered Nurse Anesthetist (an advanced practice nurse) under the direction of a staff Anesthesiologist. It has been explained to me that all forms of anesthesia involve some risk and no promises or guarantees can be made about my response to anesthetic agents, other drugs, or procedures associated with my anesthetic care. I understand that even though I am properly monitored (watched) and safety measures are taken to avoid problems, they can occur. Most anesthesia problems are minor, although rare, unexpected severe problems with anesthesia can occur. These problems and complications include, but are not limited to, the remote chance of mouth/dental injury, infection, bleeding, drug reactions, blood clots, loss of sensations, nerve injury, loss of limb or function, paralysis, stroke, unexplained brain damage, heart attack, cardiac arrest or death. I understand that that there is a remote possibility that anesthesia could injure a fetus if I am pregnant. I consent to my anesthetic plan, anesthesia services, and the administration of such anesthetics as may be considered necessary or advisable by the Anesthesiologist responsible for this service, and understand that any charge in my anesthesia plan would be made with my safety being the first concern of an Anesthesiologist. In certain interventions, a physician who is not an anesthesiologist, but who is credentialed (authorized by the hospital) to provide deep sedation may provide deep sedation to me. In these instances, all information stated above regarding risks and complications apply.

I, the undersigned, have read this form, or had it read to me, and fully understand that if I have further questions, I may ask them of my physician, including Anesthesiologist. I do hereby consent to the above described anesthetic plan.

SIGNATURES FOR CONSENT GIVEN BY REPRESENTATIVE OF PATIENT SHOULD BE OBTAINED WHEN AN ADULT PATIENT (18 AND OVER) IS UNABLE TO CONSENT, OR THE PATIENT IS A MINOR (17 YEARS OR LESS).

X _Sonji McKinney_ _Sonji McKinney_ _Self_ _3/16/23_ _7/4_
Patient (or Representative's) Signature    Printed Name    Relationship to Patient    Date    Time

_Yvonne Harper RN_ _Yvonne Harper_ _3/12/23_ _7/4_
Witness Signature    Witness Printed Name    Date    Time

I certify that I have explained, to the best of my knowledge and ability, the information set forth herein concerning the anesthetic plan.

_Thomas Bish_ _Thomas Bish_ _3-12-23_ _7:10_
Physician Signature    Physician Printed Name    Date    Time

Interpreter used (if applicable)

Informed Consent For Anesthesia    121225 (8/19)    PAGE 1 OF 1


QUESTIONED
Signature
Q 1
Document
Exhibit

# Questioned Initials

# PRISMA HEALTH.

GMH NEURO MED SURG
701 Grove Road
Greenville SC 29605

McKinney, Sonji Renae
MRN: 970752451, DOB: 3/14/1975, Sex: F
Adm: 3/10/2023, D/C: 3/15/2023

**03/10/2023 - ED to Hosp-Admission (Discharged) in Greenville Memorial Neuroscience Med Surg (continued)**

**Documents (continued)**

**Consent - Procedure - Scan on 3/10/2023**

Scan (below)

MCKINNEY, SONJI RENAE 03/14/1975  970752451

# PRISMA HEALTH.

MCKINNEY, SONJI RENAE
DOB: 3/14/1975
MRN: 970752451
RAN: 900052317011
Adm Date: 3/10/2023

**INFORMED CONSENT FOR OPERATION
AND/OR PROCEDURE**

■ Prisma Health Greenville Memorial Hospital
  ☐ Cross Creek Surgery Center
☐ Prisma Health Greer Memorial Hospital
☐ Prisma Health Hillcrest Hospital
☐ Prisma Health Laurens County Hospital
☐ Prisma Health Oconee Memorial Hospital
☐ Prisma Health Marshall I. Pickens Hospital
☐ Other _____

☐ Prisma Health Surgery Center - Spartanburg
☐ Prisma Health Roger C. Peace Hospital
☐ Prisma Health Baptist Easley Hospital
☐ Prisma Health Patewood Hospital
  ☐ Patewood Outpatient Surgery Center
☐ Prisma Health North Greenville LTAC Hospital
☐ University Medical Group (UMG/PB4

**Please read this document carefully and ask questions about anything you do not fully understand**

**PROCEDURE**

I consent to the following operation and/or procedure(s)  Cervical five - Six and
Cervical Six - Seven  anterior cervical discectomy and fusion with
Plate, screw, and allograft.  Possible cervical Six  corpectomy

to be performed by  Dr. McHenry, Lonehan, Swinford

I knowing that my doctor will have the main responsibility for my care specific to the operation(s) and/or procedure(s). I understand that doctors, who are fellows, residents, or other qualified first assistants, may be involved in my procedure under the supervision of the above doctor.

My doctor has explained to me my condition, the nature and purpose of each operation(s) and /or procedure(s), and the risks and types of complication(s) involved, the potential benefits and drawbacks, potential problems related to recovery, the likelihood of success, the possible results of non-treatment, and any reasonable options or alternatives along with the benefits and risks of the alternatives. I have had the chance to ask questions about the planned operation(s) and/or procedure(s) and all my questions have been answered to my satisfaction. I have received no promises from anyone about the results that may be obtained from the operation and/or procedure. All operations and procedures involve risks. Routine risks include, but are not limited to, perforation and/or injury to nearby blood vessels, nerves and/or organs, infection, blood clots. Other risks may include paralysis and/or death or _____

I understand that the information I have received about risks may not be fully complete and there may be other, less common risks.

Initials  SM    Date  3/11/63    Time  1440

Informed Consent for Operation and/or
Procedure/Consent-Surgical                     (PINK) (12/19)                     PAGE 1 OF 2

QUESTIONED
Q.F.I

Initials

Exhibit

# **Known Documents**





**Amended**

**South Carolina Workers' Compensation Commission**
1333 Main Street, Suite 500 • Post Office Box 1715
Columbia, South Carolina 29202-1715
(803) 737-5700   WWW.WCC.SC.GOV

WCC File #: _1510391_
Carrier File #: _____
Carrier Code #: _____
Employer FEIN #: _____

Claimant's Name: _Sonji Maynard_   SSN: _29-37-9168_
Address: _10315 Rimrod Teal Rd Apt# 101_
City: _Charlotte_   State: _NC_   Zip: _28269_
Home Phone: _980-301-9555_   Work Phone: (   )   -

Employer's Name: _Magna International_
Address: _130, Moon Acres Rd_
City: _Piedmont_   State: _SC_   Zip: _29673_

Insurance Carrier: _____

Preparer's Name: _____   Law Firm: _____   Preparer's Phone #: _804-301-2200_

A claim for workers' compensation benefits is made based on the following grounds:
☑ Injury  ☑ Illness  ☑ Repetitive Trauma  ☐ Occupational Disease  ☐ Physical Brain Injury  ☐ Concurrent Jurisdiction

1. The claimant sustained an injury to (Part(s) of Body Injured) on _7/17/2015_ (Month/Day/Year) in _Piedmont_ county, state of _SC_
2. Body part(s) affected are: _nasal and the top of my neck vo the bottom of_
   Briefly describe how the accident occurred: _my neck_   _injured_
3. Both the claimant and the employer were subject to the South Carolina Workers' Compensation Act at the time of injury. _yes_
4. The relationship of employer and employee existed at the time of injury. _3rd Party_
5. At the time of the injury the claimant was performing services arising out of and in the course of employment. _3rd Party_
6. Notice of the accidental injury was given to the Employer on _7/17/2015_ (Month/Day/Year) in the following manner: _@ 2nd_

☐ 7. Due to injury, the claimant is in need of (check one):  _A Fair Hearing_
   ☐ (a) medical examination and treatment for: _Forklift_   ☐ (b) additional medical examination and treatment for: _injury_

☐ 8. Due to injury, the claimant requests temporary total disability benefits because of lost compensable time from work and wages for the period of:

☐ 9. Claimant at MMI: ☐ Yes   ☐ No.   9a. If yes, due to the injury, the Claimant has permanent disability of the following nature and extent (check one):
   ☐ (1) General Disability: ☐ Total  ☐ Partial ☐ (2) Specific Disability: ☐ Total  ☐ Partial   ☐ (3) Wage Loss

☐ 10. Due to the injury, the Claimant has a serious bodily disfigurement consisting of: _yes_

☐ 11. At the time of the injury, the Claimant was paid weekly wages of $ _all in_ _$5,000 a month_, and demands accounting of days worked and wages earned as provided by law

☐ 12. Give names and addresses of all employers for whom the Claimant has worked at the time of the accident: _Samsung_
   _BackNate Senior – Nortec newspaper_

☐ 13. Further grounds or unusual aspects of claim: _not treated fairly and my health has declined_

☐ 13a. Appropriate benefits as provided in the Act for the above grounds and other relief as the Workers' Compensation Commission may direct as just and proper.

☐ 13b. List names and addresses of all physicians or other medical specialists who have treated the Claimant as a result of the accident: _please fax my medical records_

☐ 13c. To the best of your knowledge, did you have any prior permanent disability? _not before my accident_
   If yes, describe:

☐ 14. ☐ I am adding a party. _____ (name/address).
   ☐ I am removing a party. _____ (name/address).
   ☐ Other amendment: _____

☐ 15. I am filing a claim. I am not requesting a hearing at this time.   Estimated time needed for hearing: _ASAP_

☑ 16. I am requesting a hearing. A $50 fee is required.

☐ Mediation
   ☐ a. Mediation is requested to be ordered pursuant to Reg. 67-1801 B.
   ☐ b. Mediation is required pursuant to Reg. 67-1802.
   ☐ c. Mediation is requested by consent of the Parties pursuant to Reg. 67-1803.
   ☐ d. Mediation has been conducted by a duly qualified mediator and resulted in an impasse.
   Questions regarding mediation may be submitted to mediation@wcc.sc.gov.

I certify I have served this document pursuant to Reg. 67-211. See attached certificate of service. I verify the contents of this form are accurate and true to the best of my knowledge.

_S. Maynard_
Preparer's Signature          Title          Email          Date _10/1/2024_ (m/d/yyyy)

Refer to Regulations 67-204 - 67-211, Regulations 67-601 -67-615, and Regulation 67-1801.

**WCC Form # 50**
Revised 9/2023

**50**

**Employee's Notice of Claim and/or Request for Hearing**

KNOWN
K2
Document
Exhibit

**Bon Secours**

**AUTHORIZATION TO DISCLOSE HEALTH INFORMATION**

Sonji R McKinney    3/14/15    980-201-9755

Address: 10515 Forest Trail Dr. #101  City: Charlotte  State: NC  Zip: 28262

I Authorize: St Francis (Bons Secour)

**To Disclose the Following Information:**

☐ Abstract of Record    ☑ Admission Report    ☐ Operative Report    ☑ MyChart Communication
☑ ER Record    ☑ Keep on Image Files    ☐ Radiology Report    ☐ Other:
☐ ED Record    ☑ History & Physical    ☑ Discharge Summary    ☑ Other: All Component
                                                                          Contents

State of Visit:

**Disclose Information to:**

Recipient Name: Sonji R McKinney
Address: 10515 Forest Trail Dr. Apt 101  City: Charlotte  State: NC  Zip: 28262

Fax (healthcare provider only):

**Discharge Release (Please In default if not marked):**

☑ By Mail    ☐ Electronic Secure Chart    ☐ Pick-up MYCO    ☐ MyChart
☐ Delivery by Disc (for patient's only - email address): McKinneysonji@gmail.com

**Purpose of Disclosure:**

☐ Physician    ☐ Insurance    ☐ Legal    ☐ Other (Please specify):
☐ Disability Determination    ☑ Personal    ☐ Worker's Compensation

**Special Instructions:**

2. I understand that authorizing the disclosure of this health information is voluntary. I can refuse to sign this authorization. I need not sign this form in order to ensure treatment. I understand that I may inspect or copy the information to be used or disclosed, as provided in CFR 164.524. I understand that any disclosure of information carries with it the potential for an unauthorized redisclosure and the information may not be protected by federal confidentiality rules. If I have questions about disclosure of my health information, I can contact the organization above disclosing the information.

3. I understand that I have the right to revoke this authorization at any time. I understand that in order to revoke this authorization, I must do so in writing and present my written revocation to the facility. I understand that the revocation will not apply to information that has already been released in response to this authorization. I understand that the revocation will not apply to my insurance company when the law provides my insurer with the right to contest a claim under my policy. Unless otherwise revoked, this authorization will expire 6 months from the date of signature.

4. I understand that copying charges will be applied according to the hospital policy.

Signature of Patient or Legal Representative: S. McKinney    Date/Time: 3:06pm 7/3/24

If signed by legal representative, relationship to patient:

**Downstream Use Only**

Processed by:
(OR HIM Rep)

☐ Identity Verified    ☐ Signature Verified

South Carolina Workers' Compensation Commission
1333 Main Street, Suite 500
P.O. BOX 1715
Columbia, SC 29202-1715
803-737-5675

Claimant's Name: Sonji Mckinney   SSN: 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   Employer's Name: Magna International
Address: 10315 Ringed Teal Rd Apt 107   Address: 120 Main Lanes Rd
City: Charlotte   State: NC   Zip: 28262   City: Piedmont   State: SC   Zip: 29673
Home Phone: 980-201-9555   Work Phone: ( )   Carrier:   864-277-4200
Preparer's Name:   Preparer's Phone #: ( )

## REQUEST TO WAIVE FILING FEE

1. Are you presently employed? ☐ Yes  ☒ No
   a. If yes, state the name and address of your employer and wages below.

   If no, where did you last work, when did you stop working, and what were your wages?
   Magna International in Piedmont, SC over
   $75,000 - Just signed a $110,000 contract 5/2015

   c. Is your spouse employed? ☐ Yes  ☐ No   If yes, where?
   What are your spouse's wages? $
   d. What is the total income of all working members of your household?
   It's just me — $1656 from disability
   every 3rd Wednesday of the month

2. How many people are dependent on you for their support (include children and relatives)?
   How much do you spend weekly for their support? $ 0

3. List any money you have received in the past year other than that listed above and state from what source that money came (gift, inheritance, insurance, other).
   disability every 3rd Wednesday of the month
   $1656 a month

4. Do you have a checking or savings account? ☒ Yes  ☐ No
   If yes, what is the balance in each account?   Checking: $ 0.00   Savings: $ 0  N/A

5. Do you rent or own your home? ☒ Rent  ☐ Own   Rent or mortgage payment: $ 1344.67
6. Do you own a car? ☒ Yes  ☐ No  title loan   Payments: $ N/A can't afford right now
7. List the names of your creditors and amount of debt.
   My debt is over $60,000
   I don't know everyone who is owed

To the best of my knowledge, the information above is true and accurate. I have made no attempt to misrepresent my financial condition. I request that the filing fee be waived.

Signature: Sonji R. Mckinney   ⬅

Date: 5/22/2024

For official use only.  ☐ Fee Waived   ☐ Waiver Rejected   ☐ Other Disposition

Chair, S.C. Workers' Compensation Commission

File this form with a Form 30, Application for Commission Review. Refer to R.67-701 through R.67-711 for additional information. File this form with a Form 50, 52, 54, Requests for Motions, Consents and Settlements. Refer to R.67-207, R.67-208, R.67-215, R.67-803 and R.67-805.

WCC Form # 32
Rev. 1/19

**32**

REQUEST TO WAIVE FILING

KNOWN
K4
Document
Exhibit

PRISMA
HEALTH.

GMH EMERGENCY DEPT
701 Grove Road
Greenville SC 29605

McKinney, Sonji Renae
MRN: 970752451, DOB: 3/14/1975, Sex: F
Adm: 3/4/2023, D/C: 3/4/2023

**03/04/2023 - ED in Prisma Health Greenville Memorial Hospital Emergency Department (continued)**

## Documents

### Discharge Instructions/Patient Education - Scan on 3/4/2023

Scan (below)
MCKINNEY, SONJI RENAE 03141975 970752451

---

McKinney, Sonji Renae (MRN 970752451)                          Encounter Date: 03/04/2023

PRISMA
HEALTH.

**Sonji Renae McKinney**                          Department: Prisma Health Greenville
3/4/2023  ED                                      Memorial Hospital Emergency Department

**Sonji Renae McKinney**

Patient Signature  S /Ill/(\(aac                          Date  3/4/23

E954569

Visit Information

| Date & Time | Provider | Department | Encounter # |
|---|---|---|---|
| 3/4/2023 10:30 AM | Witt, Scott Hebreth, MD | Prisma Health Greenville Memorial Hospital Emergency Department | 1000284287411 |

Patient Summary
Identified
CDU 058/CDU 058

---

KNOWN
K5
Document
Exhibit


expressed within this document. The terms of this Release and Agreement are contractual and are not a mere recital. We further acknowledge and represent that we have sought and received the advice of legal counsel before executing this Release and Agreement. We have read this Release and Agreement and we understand it to be a full, final, and binding agreement. We also warrant and represent that we are of lawful age and legal capacity to execute this Release and Agreement.

Page 4 of 5

IN WITNESS WHEREOF, We have hereunto set my hand and seal this ___ day of
_____, 2019.

WITNESSES:

_____          _____(SEAL)
                                   Sonja Renae McKinney

_____

CERTIFICATE OF COUNSEL

I, the undersigned, attorney for Sonja Renae McKinney, have been available to them to discuss the foregoing Agreement and Release, and have explained the same to them in regard to any questions they may have had, and have supervised its execution either in person or by other means of verification that it has been properly executed.

_____
Richard K. Allen, III, Esquire
Guest & Brady, LLC

6 of 8

KNOWN
K6
Document
Exhibit



### Employee Acceptance

I hereby accept the offer of employment set out above. I further acknowledge that I have been provided with a reasonable opportunity to obtain independent advice prior to agreeing to the terms set out above, and that I have entered into this agreement voluntarily. I agree that no other representations, promises or warranties have been relied upon.

Furthermore, I confirm that I have not been asked by the Company nor does the Company want me to disclose any information available to me through my current place of employment that is not already in the public domain. I agree that I will not retain any confidential or proprietary information belonging to any of my previous employers in any format or medium, including hard copy or electronic form. In addition, I will not use any such confidential or proprietary information in my employment with the Company nor will offer such information to the Company or provide such information should I be requested to do so. I further confirm that I will not access, download, store, record, retain, or otherwise disclose any confidential or proprietary information belonging to my previous employers using any electronic device, personal computer, communications system or storage medium. I am not subject to any contractual terms or restrictions with my previous employer that would interfere in a material way with my ability to perform the essential duties and responsibilities of my employment with the Company. I understand that the Company has relied upon the foregoing representations for the purposes of extending an offer of employment to me, and that my continuing employment with the Company will be conditional upon my ongoing compliance with these requirements.

I further acknowledge that in order to manage the employment relationship, it will be necessary for the Company to collect and use certain personal information about me, as well as my beneficiaries and dependents. I grant my consent to the collection and use of this information, as well as to the disclosure of relevant personal information to employees, affiliates and agents of the Company where necessary for legitimate business reasons, including performance and attendance management, and administration of the Company's compensation, employee benefit, profit sharing and retirement programs.

_Sonji McKinney_
**Sonji McKinney**

_5/14/15_
**Date**

KNOWN
K7
Document
Exhibit



Drive Automotive Industries of
America Inc.

120 Moon Acres Road
Piedmont, SC 29673
Tel (864) 277-4200
Fax (864) 277-0437

Sonji McKinney
Production Supervisor
Assembly

Date: May 11, 2015

To:

The Manager

Drive Automotive

Leadership Training Course

Dear Sir,

I, Sonji McKinney S. McKinney have been with Drive Automotive and recently
promoted to Production Supervisor. Drive Automotive would like to support your success and
have partnered with Greenville Technical Institute to provide Leadership Courses to assist in you
within your new roles & responsibilities.

It is suggested that Leadership Training will provide new knowledge which you will be able to
apply on a daily basis at Drive Automotive.

This is an exciting time for you in your new role; it is also exciting to learn new skills to enhance
your ability to perform successfully.

Please contact Rena Amadi in Human Resources if you have any questions.

Regards,

Craig Lane
General Manager
Drive Automotive Industries

KNOWN
K8
Document
Exhibit

bankofamerica.com          12330 ▶ 09/22                    F85355

███████████████ 7523

**Valid Thru: 11/27**     Sec Code: 480

**SONJI R MCKINNEY**



US and Canada **800.432.1000**
International Collect **315.724.4022**
Para Español **800.688.6086**

---

## NORTH CAROLINA  DRIVER LICENSE

*Wayne Goodwin*
**COMMISSIONER OF MOTOR VEHICLES**



4d DLN ████████ **4449**     3 DOB ████████
                            4b EXP **03/14/2032**

1 **MCKINNEY**
2 **SONJI RENAE**
8 ███████████████

**CHARLOTTE, NC 28262-1480**

9 CLASS **C**     9a END **NONE**
12 RESTR **1**
15 SEX **F**     18 EYES **BRO**     ♥
16 HGT **5'-05"**   19 HAIR **BLK**   RACE



4a ISS **02/21/2024**        **03/14/75**
5 DD **0037251828**

KNOWN
**K9**
Document Exhibit

KNOWN
**K10**
Document Exhibit



**RCP REHABILITATION**
701 Grove Road
Greenville SC 29605

McKinney, Sonji Renae
MRN: 970752451, DOB: 3/14/1975, Sex: F
Adm: 3/15/2023, D/C: 3/29/2023

**03/15/2023 - Admission (Discharged) in Roger C. Peace Rehabilitation (continued)**

## Documents (continued)

MCKINNEY, SONJI RENAE 03/14/1975 970752451



MCKINNEY, SONJI RENAE
DOB: 3/14/1975
MRN: 970752451
RAN: 1120921 57455
Adm Date: 3/15/2023

**PERMISSION TO TREAT**

and other information to help you manage your health. The messages may come from your provider, Prisma Health or from our partners who are helping to manage your care. The responsibility of scheduling and canceling appointments will still rest with you, but we hope this service will make things easier.

You may be contacted by Prisma Health using email for transmission of notices regarding billing statements. Such email notices and text messages are unencrypted and are, therefore, considered unsecure communications and will not include information specific to your clinical information, but they may include information that would be of interest to you because of your health condition. When we send text messages, we will never transmit your full name or address in the text message.

**If you DO NOT wish to allow contacting in these manners, please notify a Prisma Health team member in the business office/patient access/ registration, respond to the "opt-out" directions in the text message or choose your communication preference in the patient portal.**

I understand if I provide my cellphone number, home phone number, work phone number, and email address and do not tell anyone that I do not want to be contacted in the manners described, I am consenting to receive phone calls, text messages and emails for appointment scheduling and other healthcare reminders and information as described above. I will keep my provider informed of my up-to-date mobile number and email address at all times and notify my provider if the mobile number is no longer in my possession.

I understand that even if I do state that I do not wish to be contacted as described above, my provider, Prisma Health or our partners may still contact me by phone call for scheduling and scheduled appointments, recommended tests, and other information to help me manage my health.

**HEALTHCARE ASSOCIATED INFECTIONS:** Healthcare-associated infections can be a complication of hospitalization. The SC Hospital Infections Disclosure Act, S.C. § 44-7-2410, requires hospitals to monitor and report targeted healthcare-associated infections to the SC Department of Health and Environmental Control (DHEC). These reports are available on the following website for public view: http://www.scdhec.gov/Health/FHPF/InfectionControl/HDA/HospitalInfectionControl/

**I understand that the practice of medicine and the security of personal or health information is not an exact science and that not all risks can be eliminated and that NO GUARANTEES HAVE BEEN MADE TO ME.**

**I SIGN BELOW ACKNOWLEDGING THAT I HAVE READ, ASKED QUESTIONS AND UNDERSTAND AND AGREE TO ALL FOUR PAGES OF THIS FORM.**

3/14/23
DATE TIME        SIGNATURE OF WITNESS          SIGNATURE OF PATIENT/LEGALLY AUTHORIZED REPRESENTATIVE

DATE TIME        SIGNATURE OF INTERPRETER        PRINT NAME OF RELATIONSHIP IF LEGAL REPRESENTATIVE
                 (IF OTHER THAN FACE-TO-FACE, USE PHONE)

emission to Treat Permission Form        M10029 (05/22)        Page 4 of 4

KNOWN
Document
Exhibit

Case 3:25-cv-00681-MOC-DCK    Document 19-1    Filed 10/01/25    Page 20 of 53



RCP REHABILITATION
701 Grove Road
Greenville SC 29605

McKinney, Sonji Renae
MRN: 970752451, DOB: 3/14/1975, Sex: F
Adm: 3/15/2023, D/C: 3/29/2023

03/15/2023 - Admission (Discharged) in Roger C. Peace Rehabilitation (continued)

**Documents (continued)**

MCKINNEY, SONJI RENAE 01141975 970752451

How to Ask for an Appeal of your Hospital Discharge
• You must make your request to the QIO listed above



• Your request for an appeal should be made as soon as possible, but no later than your planned discharge date and before you leave the hospital

• The QIO will notify you of its decision as soon as possible, generally no later than 1 day after it receives all necessary information

• Call the QIO listed on Page 1, to appeal, or if you have questions

If You Miss The Deadline to Request An Appeal, You May Have Other Appeal Rights.

• If you have Original Medicare - Call the QIO listed on Page 1

• If you belong to a Medicare health plan - Call your plan at
  MEDICARE WELLCARE   866-270-5223

For more information, call 1-800-MEDICARE (1-800-633-4227), or TTY: 1-877-486-2048. CMS does not discriminate in its programs and activities. To request this publication in an alternate format, please call: 1-800-MEDICARE or email: AltFormatRequest@cms.hhs.gov.

Additional Information (Optional)

Please sign below to indicate you received and understood this notice

I have been notified of my rights as a hospital inpatient and that I may appeal my discharge by contacting my QIO .

S. Mollyxxlu

3/29/23  3:30pm

Signature of Patient or Representative          Date / Time

3/28/23  3:30pm

You have the right to get Medicare information in an accessible format, like large print, Braille, or audio. You also have the right to file a complaint if you feel you've been discriminated against. Visit Medicare.gov/about-us/accessibility-nondiscrimination-notice, or call 1-800-MEDICARE (1-800-633-4227) for more information. TTY users can call 1-877-486-2048.

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-1019. The time required to complete this information collection is estimated to average 15 minutes per response, including the time to review instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, 7500 Security Boulevard, Attn: PRA Reports Clearance Officer, Mail Stop C4-26-05, Baltimore, Maryland 21244-1850.

Form CMS-10065-NM (Exp. 12/31/2025)                    OMB approval 0938-1019

KNOWN
K12
Document
Exhibit


# PRISMA HEALTH.

**RCP REHABILITATION**
701 Grove Road
Greenville SC 29605

McKinney, Sonji Renae
MRN: 970752451, DOB: 3/14/1975, Sex: F
Adm: 3/15/2023, D/C: 3/29/2023

**03/15/2023 - Admission (Discharged) in Roger C. Peace Rehabilitation (continued)**

## Documents (continued)

### Consent Form - Hospital - Scan on 3/15/2023

Scan (below)

MCKINNEY, SONJI RENAE  03141975  970752451

 

**PATIENT PREFERENCE LETTER**

MCKINNEY, SONJI RENAE
DOB: 3/14/1975
MRN: 970752451
MAE: 1320041273S
Adm Date: 3/15/2023

Your physician has recommended follow-up care for you. You have the right to select any facility, agency, or provider to provide the care ordered by your physician. If you have insurance they may have a preferred provider recommendation based on your specific policy coverage. Regardless, it is your preference to select the facility, agency, or provider you prefer.

If you need more information before making this decision, please ask your case manager to assist you. Your case manager can provide you with a list of facilities, agencies, or providers but cannot recommend or make the choice for you.**

Service(s) ordered for you:
Home Health
Home Hospice Service
Hospice House
Skilled Nursing Facility
Acute Rehab
Long-Term Acute Hospital
Durable Medical Equipment
Assisted Living Facility
Infusion Services

Patient preference for service(s)




I have been provided information to make this decision. I have been included in my discharge plan decision and agree with the post hospital care arranged.

S. McKinney
Patient/family signature

3/28/23 3:30 pm
Date/Time

*Greenville Health System has an affiliation with:
Agape Hospice, Care Healthcare, Compassus Hospice, Gentiva Hospice, Hospice of the Upstate, Regency Hospice, Home Choice Partners, HeartLand Health Care Centers of Greenville-West

**Greenville Health System has a financial interest in:
GHS Home Health, Foothills Hospice of the Upstate, Cottingham House, Oconee Memorial Home Health, The Cottages at Brushy Creek, Roger C. Peace Rehabilitation Hospital, North Greenville Long-Term Acute Care Hospital, Lila Doyle Skilled Nursing Facility, Equipped For Life, Greenville Memorial Medical Center Sub-Acute, Transitional Life Center LCMH

PATIENT PREFERENCE LETTER                    M0001 3/15                    PAGE 1 OF 1

KNOWN
K13
Document
Exhibit

**PRISMA HEALTH.**

RCP REHABILITATION
701 Grove Road
Greenville SC 29605

McKinney, Sonji Renae
MRN: 970752451, DOB: 3/14/1975, Sex: F
Adm: 3/15/2023, D/C: 3/29/2023

**03/15/2023 - Admission (Discharged) in Roger C. Peace Rehabilitation (continued)**

**Documents (continued)**

**Discharge Instructions/Patient Education - Scan on 3/15/2023**

Scan (below)

MCKINNEY, SONJI RENAE 03141975 970752451

Discharge Instructions

Patient Signature _S. Mar____

Discharge Instructions reviewed with Patient and Patient's Representative by Licensed Nurse

Patient's Representative _____

Relationship to Patient _____ Date  3/29/23

MCKINNEY, SONJI RENAE
DOB: 3-14-1975
MRN: 970752451
HAR: 31200037139
Adm Date: 3/15/2023

KNOWN
K14
Document
Exhibit



RCP REHABILITATION
701 Grove Road
Greenville SC 29605

McKinney, Sonji Renae
MRN: 970752451, DOB: 3/14/1975, Sex: F
Adm: 3/15/2023, D/C: 3/29/2023

03/15/2023 - Admission (Discharged) in Roger C. Peace Rehabilitation (continued)

**Documents (continued)**

**Medicare Important Message Sign - Scan on 3/19/2023 1:53 PM**

Scan (below)

How to Ask for an Appeal of your Hospital Discharge
- You must make your request to the QIO listed above.

- Your request for an appeal should be made as soon as possible, but no later than your planned discharge date and before you leave the hospital.

- The QIO will notify you of its decision as soon as possible, generally no later than 1 day after it receives all necessary information.

- Call the QIO listed on Page 1, to appeal, or if you have questions.

If You Miss The Deadline to Request An Appeal, You May Have Other Appeal Rights:

- If you have Original Medicare:  Call the QIO listed on Page 1.

- If you belong to a Medicare health plan:  Call your plan at
MEDICARE WELLCARE   866-270-5223

For more information, call 1-800-MEDICARE (1-800-633-4227), or TTY: 1-877-486-2048. CMS does not discriminate in its programs and activities. To request this publication in an alternate format, please call: 1-800-MEDICARE or email: AltFormatRequest@cms.hhs.gov.

Additional Information (Optional):

Please sign below to indicate you received and understood this notice.

I have been notified of my rights as a hospital inpatient and that I may appeal my discharge by contacting my QIO.

X _____     3/19/23   1:39 PM
Signature of Patient or Representative          Date / Time

You have the right to get Medicare information in an accessible format, like large print, Braille, or audio. You also have the right to file a complaint if you feel you've been discriminated against. Visit Medicare.gov/about-us/accessibility-nondiscrimination-notice, or call 1-800-MEDICARE (1-800-633-4227) for more information. TTY users can call 1-877-486-2048.

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-1019. The time required to complete this information collection is estimated to average 15 minutes per response, include the time to review  instructions, search existing data resources, gather the data needed, and complete and review the information collection. If you have comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, 7500 Security Boulevard, Attn: PRA Reports Clearance Officer, Mail Stop C4-26-05, Baltimore, Maryland 21244-1850

Form CMS 10065-IM (Exp. 12/31/2025)                    OMB approval 0938-1019

K15



**PRISMA HEALTH.**

GMH NEURO MED SURG
701 Grove Road
Greenville SC 29605

McKinney, Sonji Renae
MRN: 970752451, DOB: 3/14/1975, Sex: F
Adm: 3/10/2023, D/C: 3/15/2023

Documents (continued)

MCKINNEY, SONJI RENAE 03142975 970752451

MCKINNEY, SONJI RENAE
DOB: 3/14/1975
MRN: 970752451
ID/C: 970752451/0451
Adm Date: 3/10/2023

**Refusal of Consent for Blood Product Transfusion**

☐ I do not consent to receiving any type of blood or blood products. I acknowledge that my Authorized Practitioner has explained to me the possible risks of my turning down blood products. I have talked about this with my Authorized Practitioner, and I understand the possible risks. I understand that turning down blood products could result in my getting sicker or dying. By turning down blood products is not to be ignored under any condition by a relative or other person even though I may be unable to say what I want at that time. I understand I may change my mind at any time by talking to my Authorized Practitioner. At no time will I blame Prisma Health, its Board, personnel, the treating physicians, and other staff members for any bad health results that happen due to my turning down blood products. This information set forth herein has been explained to me and I am satisfied with what I was told. All my questions have been answered. I know that I can ask more questions, but do not have any more at this time.

**Limited Consent/Alternatives Only**

☐ I consent to the following blood products, medications, and procedures related to bleeding ordered by my Authorized Practitioner that are checked below. The information set forth herein has been explained to me and I am satisfied with what I was told. All my questions have been answered. I know that I can ask more questions, but do not have any more at this time.

I will accept the following blood products that are checked:

☐ Red Blood Cells   ☐ Fresh Frozen Plasma   ☐ Platelet   ☐ Cryoprecipitate

I will accept the following Medications that are checked:

☐ Albumin   ☐ Erythropoietin   ☐ Human Immunoglobulin   ☐ Other _____

I will accept procedures that return my own blood to me, such as the use of the Cell Saver if checked:

☐ Cell Salvage

I will accept Family member and/or Self-donation (donating your own blood ahead of time) that must be done prior to my surgery:

☐ Family member donation   ☐ Self-donation

| | | |
|---|---|---|
| S. McKinney | 3/11/23 | PM |
| Patient's (or representative's) signature | Print Name/Relationship to Patient | Date/Time |
| Witness | Maunella RN | 3/11/23 PM |
| | Print Name | Date/Time |

I have explained to the best of my knowledge and ability the information set forth herein concerning the consent for or refusal of blood/blood products.

| | | |
|---|---|---|
| Authorized Practitioner Signature | Matt Anderson | 3/11/23 1996 |
| | Printed Name | Date/Time |

Interpreter used (if applicable)

Informed Consent for or Refusal of Blood and/or Blood Products   MR85140-5973   Page 2 OF 2
Consent Form Blood



K16
Document
Exhibit

## PRISMA HEALTH™

GMH NEURO MED SURG
701 Grove Road
Greenville SC 29605

McKinney, Sonji Renae
MRN: 970752451, DOB: 3/14/1975, Sex: F
Adm: 3/10/2023, D/C: 3/15/2023

**03/10/2023 - ED to Hosp-Admission (Discharged) in Greenville Memorial Neuroscience Med Surg (continued)**

**Documents (continued)**

MCKINNEY, SONJI RENAE 03/14/1975 970752451

## PRISMA HEALTH.

MCKINNEY, SONJI RENAE
DOB: 3/14/1975
MRN: 970752451
Adm: 3/10/2023 

**INFORMED CONSENT FOR OPERATION AND/OR PROCEDURE**

My doctor has informed me that there is a chance that more operations and/or procedure(s) may be needed based on the findings during the operation(s) and/or procedure(s) described above. I understand that the nature of any extra operation(s) or procedure(s) are not known at this time, but I accept the risks that may be related with any extra operation(s) and/or procedure(s) and consent to extra operation(s) or procedure(s) that my doctor feels are medically needed.

I give permission to give my name, address and social security number and/or medical record number to the manufacturer of any surgical implants or devices used in the operation and/or procedure.

I understand that Prisma Health-Upstate is a teaching hospital and certain people, according to hospital policy, may observe and at times take part in my care. I have discussed any concerns I might have regarding these people with my doctor.

**CODE STATUS**

Unless I show otherwise by writing my initials below, I want my code status to be **FULL CODE** during my operation(s) and/or procedure(s) so that if I have a cardiac or respiratory arrest (my heart stops beating as I should or I stop breathing as I should), the healthcare providers taking care of me will try to resuscitate me. I understand that my status will remain **FULL CODE** until I have fully recovered from any effects of anesthesia. At that time, my former code status, if not **FULL CODE**, will be re-ordered by my physician.

_____ **I do not want to be a FULL CODE.** If I have a cardiac or respiratory arrest during the operation(s) or procedure(s), I want my healthcare providers to obey my prior stated wishes regarding resuscitation.

I have read this form, or had it read to me, and fully understand that if I have more questions, I may ask them of my doctor. I do hereby consent to the above described operation(s) and/or procedure(s).

**SIGNATURES FOR CONSENT GIVEN BY REPRESENTATIVE OF PATIENT SHOULD BE OBTAINED WHEN AN ADULT PATIENT (18 AND OVER) IS UNABLE TO CONSENT, OR THE PATIENT IS A MINOR (17 YEARS OR LESS).**

_S. McKinney_____    _____    3/11/23    15 4c
Patient (or Representative's) Signature    Printed Name    Relationship to Patient    Date    Time

_signature_    _M Cunningham_    3/11/23    14 4c
Witness Signature    Witness Printed Name    Date    Time

I certify that I have explained, to the best of my knowledge and ability, the information set forth herein concerning the operation(s) and/or procedure(s).

_signature_    _Matt Anderson_    3/11/23    14 4c
Proceduralist    Printed Name    Date    Time

Interpreter used (if applicable) _____

Informed Consent for Operation and/or Procedure Consent    341548 (10/18)    PAGE 2 OF 2
Surgery

K17
Document
Exhibit

Case 3:25-cv-00681-MOC-DCK    Document 19-1    Filed 10/01/25    Page 26 of 53

# Known Initials

# PRISMA
## HEALTH.

GMH NEURO MED SURG
701 Grove Road
Greenville SC 29605

McKinney, Sonji Renae
MRN: 970752451, DOB: 3/14/1975, Sex: F
Adm: 3/10/2023, D/C: 3/15/2023

**03/10/2023 - ED to Hosp-Admission (Discharged) in Greenville Memorial Neuroscience Med Surg (continued)**

## Documents (continued)

Relationship to patient:

     ⦿ Self   ○ Parent   ○ Legal Guardian   ○ Other

Define "Other": [_____]

Name of Personal Representative: [_____]

Signature of Patient or Representative

*Sann*

Signature captured at 3/10/2023 05:37 PM

Prisma Health Representative: **Nellie Everette**

Permission To Treat - Permission Form      M10029 (05/22)      PAGE [pageNum] OF [pageCount]

---



**PRISMA**
HEALTH.

GMH EMERGENCY DEPT
701 Grove Road
Greenville SC 29605

McKinney, Sonji Renae
MRN: 970752451, DOB: 3/14/1975, Sex: F
Adm: 3/4/2023, D/C: 3/4/2023

**03/04/2023 - ED in Prisma Health Greenville Memorial Hospital Emergency Department (continued)**

**Documents (continued)**

Relationship to patient:

      ⊙ Self    ○ Parent    ○ Legal Guardian    ○ Other

Define "Other": [                                        ]

Name of Personal Representative: [                              ]



Prisma Health Representative: <u>Africa T Chappelle</u>

Permission To Treat - Permission Form      M10029 (05/22)      PAGE [pageNum] OF [pageCount]

**PRISMA**
HEALTH.

GMH EMERGENCY DEPT
701 Grove Road
Greenville SC 29605

McKinney, Sonji Renae
MRN: 970752451, DOB: 3/14/1975, Sex: F
Adm: 3/9/2023, D/C: 3/9/2023

**03/09/2023 - ED in Prisma Health Greenville Memorial Hospital Emergency Department (continued)**

**Documents (continued)**

Relationship to patient:    ⦿ Self    ○ Parent    ○ Legal Guardian    ○ Other

Define "Other":

Name of Personal Representative:

Prisma Health Representative: Morgan Sarra

Permission To Treat - Permission Form          M10029 (05/22)          PAGE [pageNum] OF [pageCount]

# PRISMA HEALTH.

GMH NEURO MED SURG
701 Grove Road
Greenville SC 29605

McKinney, Sonji Renae
MRN: 970752451, DOB: 3/14/1975, Sex: F
Adm: 3/10/2023, D/C: 3/15/2023

**03/10/2023 - ED to Hosp-Admission (Discharged) in Greenville Memorial Neuroscience Med Surg (continued)**

**Documents (continued)**



How to Ask for an Appeal of your Hospital Discharge
- You must make your request to the QIO listed above.

- Your request for an appeal should be made as soon as possible, but no later than your planned discharge date and before you leave the hospital.

- The QIO will notify you of its decision as soon as possible, generally no later than 1 day after it receives all necessary information.

- Call the QIO listed on Page 1, to appeal, or if you have questions.

If You Miss The Deadline to Request An Appeal, You May Have Other Appeal Rights:

- If you have Original Medicare: Call the QIO listed on Page 1.

- If you belong to a Medicare health plan: Call your plan at
  MEDICARE WELLCARE  866-270-5223

**For more information, call 1-800-MEDICARE (1-800-633-4227), or TTY: 1-877-486-2048. CMS does not discriminate in its programs and activities. To request this publication in an alternate format, please call: 1-800-MEDICARE or email: AllFormatRequest@cms.hhs.gov.**

Additional Information (Optional):

Please sign below to indicate you received and understood this notice.

I have been notified of my rights as a hospital inpatient and that I may appeal my discharge by contacting my QIO.

Signature of Patient or Representative                    Date / Time

You have the right to get Medicare information in an accessible format, like large print, Braille, or audio. You also have the right to file a complaint if you feel you've been discriminated against. Visit Medicare.gov/about-us/accessibility-nondiscrimination-notice, or call 1-800-MEDICARE (1-800-633-4227) for more information. TTY users can call 1-877-486-2048.

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-1019. The time required to complete this information collection is estimated to average 15 minutes per response, include the time to review instructions, search existing data resources, gather the data needed and complete and review the information collection. If you have comments concerning the accuracy of the time estimate(s) or suggestions for improving this form, please write to: CMS, 7500 Security Boulevard, Attn: PRA Reports Clearance Officer, Mail Stop C4-26-05, Baltimore, Maryland 21244-1850.

Form CMS 10065-IM (Exp. 12/31/2025)                    OMB approval 0938-1019


Case 3:25-cv-00681-MOC-DCK    Document 19-1    Filed 10/01/25    Page 31 of 53

**PRISMA HEALTH.**

GMH NEURO MED SURG
701 Grove Road
Greenville SC 29605

McKinney, Sonji Renae
MRN: 970752451, DOB: 3/14/1975, Sex: F
Adm: 3/10/2023, D/C: 3/15/2023

**03/10/2023 - ED to Hosp-Admission (Discharged) in Greenville Memorial Neuroscience Med Surg (continued)**

Documents (continued)

Call Date/Time: 03/10/2023 15:00:54
Patient Name: McKinney, Sonji

Incident #: 230310 017367
Destination: Prisma Health Greenville
Memorial Hospital

**Status:** Signed

**Signature Graphic:**

**Printed Name:** Sonji McKinney

**Date/Time Signature Locked:** 03/10/2023 16:34:55

**PPE, Work Related Exposure, Injury, or Death**

**Attachments**

**Time:** 03/10/2023 16:18:20
**File Name:** Physio_20230310161820.png

**Time:** 03/10/2023 16:19:38
**File Name:** Physio_20230310161938.png

**Time:** 03/10/2023 16:29:28
**File Name:** Physio_20230310162928.png

**Time:** 03/10/2023 16:33:46
**File Name:** Physio_20230310163346.png

**File Name:** 20230310161820_LP02
**Modified By:** Japhia Rugh
**Modified On:** 03/10/2023 16:57:59

**Hospital Outcome**

Page 7 of 9

KNOWN
KI5

Initials

Exhibit

Case 3:25-cv-00681-MOC-DCK    Document 19-1    Filed 10/01/25    Page 32 of 53

PRISMA HEALTH.

GMH NEURO MED SURG
701 Grove Road
Greenville SC 29605

McKinney, Sonji Renae
MRN: 970752451, DOB: 3/14/1975, Sex: F
Adm: 3/10/2023, D/C: 3/15/2023

**03/10/2023 - ED to Hosp-Admission (Discharged) in Greenville Memorial Neuroscience Med Surg (continued)**

Documents (continued)

Consent - Blood - Scan on 3/10/2023

Scan (below)

MCKINNEY, SONJI RENAE (3141975 970752451

PRISMA
HEALTH.

MCKINNEY, SONJI RENAE
DOB: 3/14/1975
MRN: 970752451
HAR: 80006572811
Adm Date: 3/10/2023

INFORMED CONSENT FOR/OR REFUSAL OF
BLOOD AND/OR BLOOD PRODUCTS

My Authorized Practitioner has explained to me that my permission is needed for the hospital to give me blood products. I understand that the blood products are from the local blood supply. The blood is tested for infectious diseases, such as HIV, before blood is given. It is tested again to make sure it is the right type for me.

**Benefits of Transfusion:** My Authorized Practitioner has explained to me the possible benefits from receiving blood or blood products. Red blood cells are needed to carry enough oxygen and nutrients to all parts of the body, to fight infection, and prevent shock. A transfusion may be needed to replace blood lost due to surgery, an injury, or to raise the blood count level when the body is not able to produce enough normal blood cells on its own. Other blood products are also important in helping the blood to clot to prevent or stop bleeding.

**Risks of transfusion:**
I understand that RISKS exist despite the fact that all precautions are taken. I have been informed that these potential risks include but are not limited to:

   A. **Occasional complications:** Fever, chills, allergic reactions such as hives.
   B. **Infrequent complications:** Hepatitis or infection due to transmission of blood borne viruses, heart failure, antibody development, bleeding, abnormal clotting, or lung damage.
   C. **Very rare complications:** Transfusion of blood or blood products involve a risk of transmission of diseases such as Hepatitis B, Hepatitis C, and HIV/AIDS. There is also a risk of bacterial infection, hemolysis (destruction of the transfused red blood cells) with fever, shock, chest pain, and/or blood in urine that could lead to kidney failure. Although very rare, these infectious diseases and reactions may cause illness and even death.

**Risk of declining transfusion:**
My Authorized Practitioner has explained the risk of not getting blood products could cause me harm such as worsening of my condition, further blood loss, organ failure, and death.

**Alternatives:**
My Authorized Practitioner has explained that there are other choices besides getting blood. Alternatives to transfusion of blood from anonymous volunteer donors, which is the usual procedure, include but are not limited to:
   a. Delay or change in treatment options, including the use of drugs that may help stop bleeding, methods used during and after surgery to save my own blood cells, drugs to cause my body to make new blood cells, other drugs, or fluids.
   b. Family member and/or Self-donation (donating your own blood ahead of time) must be done prior to my surgery.
   C. No transfusion.

**INSTRUCTIONS:** Check only one option below (Consent for Blood Product Transfusion or Refusal of Consent for Blood Product Transfusion or Limited Consent/Alternatives Only). If Limited Consent/Alternatives Only is selected check all options that apply within this section.

**Consent for Blood Product Transfusion**

☑ I consent to the transfusion of any blood or blood products deemed necessary for my medical care. I acknowledge that my Authorized Practitioner has explained the benefits, risks, and alternatives of getting a transfusion. The information set forth herein has been explained to me and I am satisfied with what I was told. All my questions have been answered. I know that I can ask more questions, but do not have any more at this time.

Initials: _SM_      Date: _3/10/3_      Time: _1946_

Informed Consent for Refusal of Blood and/or Blood Product/Consent Form for Blood          PAGE 1 OF 2

Initials

KNOWN
Document
Exhibit


expressed within this document. The terms of this Release and Agreement are contractual and are not a mere recital. We further acknowledge and represent that we have sought and received the advice of legal counsel before executing this Release and Agreement. We have read this Release and Agreement and we understand it to be a full, final, and binding agreement. We also warrant and represent that we are of lawful age and legal capacity to execute this Release and Agreement.

Page 4 of 5  

IN WITNESS WHEREOF, We have hereunto set my hand and seal this _14_ day of

_____, 2019.

WITNESSES:

_____

_____                    _____(SEAL)
                                           Sonja Renae McKinney



CERTIFICATE OF COUNSEL


I, the undersigned, attorney for Sonja Renae McKinney, have been available to them to discuss the foregoing Agreement and Release, and have explained the same to them in regard to any questions they may have had, and have supervised its execution either in person or by other means of verification that it has been properly executed.

_____
Richard K. Allen, III, Esquire
Guest & Brady, LLC
000 E. North Street, Suite 210

KNOWN
Document
Exhibit

# **Enlargements**

# Questioned Signature





# Known Signatures









e applied, according to the hospital policy.

ve _____

ationship to patient:

KNOWN

K3

Document
Exhibit

To the best of my knowledge, the information above i

filing fee be waived.

Signature

KNOWN

K4

Document
Exhibit

Kinney

KNOWN

K5

Document
Exhibit

(SE

Sonja Renae McKinney

KNOWN

K6

Document
Exhibit



**Sonji McKinney**



KNOWN

K7

Document
Exhibit



on Supervisor. Drive



KNOWN

K8

Document
Exhibit





KNOWN

K9

Document
Exhibit



KNOWN
K 10
Document
Exhibit

NATURE OF PATIENT/LEGALLY AUTHORIZED RE

KNOWN
K11
Document
Exhibit

contacting my QIO .

gnature of Patient or Representative

KNOWN
K12
Document
Exhibit

Patient/family signature

KNOWN
K13
Document
Exhibit

_S. McKinney_ 

KNOWN
K14
Document
Exhibit

contacting my GTC.

_S. McKinney_ 

gnature of Patient or Representa

KNOWN
K15
Document
Exhibit

_S. McKinney_ 

'atient's (or representa

KNOWN
K16
Document
Exhibit

_S. McKinney_

tient (or Representative's) Sign

KNOWN
K17
Document
Exhibit

# Questioned Initials





# Known Initials













 

 

 

 

# Exhibit 1

# Sharon Ottinger

**Curriculum Vitae**
**Court-Qualified, Expert Document Examiner**
123Forgery@gmail.com ~ 123Forgery.com ~ 713-859-6882
P. O. Box 241, Seabrook, TX 77586-0241

## PROFESSIONAL SUMMARY

Sharon Ottinger is a Court-Qualified Expert Document Examiner and skilled authority in handwriting identification with approximately 20 years of experience in signature and document examination.

## EDUCATION

Bachelor of Science - May 1992
University of Houston - Clear Lake, Houston, TX

Master of Education - School Counseling - December 1997
Dallas Baptist University, Dallas, TX

Master of Education - Educational Administration - December 2010
Lamar University, Beaumont, TX

## TRAINING & EXPERIENCE

Ms. Ottinger was in an apprentice program from September 2003 until September 2005 with one of the leading court-qualified forensic expert document examiners in the U.S. After her apprenticeship, she worked part-time for approximately fourteen years where she analyzed, compared, and examined "Known" and "Questioned" signatures, handwriting, and documents. Ms. Ottinger has been working independently for over six years and devoting herself to full-time document examination since January 2019.

Ms. Ottinger also attended workshops and seminars on various aspects of Document Examination. Some topics included proper examination of various types of signatures, handwriting identification, handwriting discrimination, distinguishing whether a signature or handwriting is authentic, determining disguised handwriting, analyzing altered numerals, and correctly labeling signatures and documents.

Additionally, her ongoing education includes enrollment in a twelve-month online course entitled *Training Course in Questioned Handwriting & Document Examination* by Reed Hayes.

## SERVICES PROVIDED

- VERBAL OPINION - This includes examining/analyzing a suspected signature or document whereby a professional, expert **verbal** opinion is offered.
- Notarized LETTER OF OPINION - This is available after the completion of an examination/analysis of a signature or document and is a **written** letter that includes a professional, expert opinion with supporting documentation.
- DEPOSITION – Can be given either in person or via ZOOM
- COURT TESTIMONY – Can be given either in person or via ZOOM

# Exhibit 2

## SWGDOC Standard for Examination of Handwritten Items

1. Scope

1.1 This standard provides procedures that should be used by forensic document examiners (SWGDOC Standard for Scope of Work of Forensic Document Examiners) for examinations and comparisons involving handwritten items and related procedures.

1.2 These procedures are applicable whether the examination and comparison is of questioned and known items or of exclusively questioned items.

1.3 These procedures include evaluation of the sufficiency of the material (questioned, or known, or both) available for examination.

1.4 The particular methods employed in a given case will depend upon the nature of the material available for examination.

1.5 This standard may not cover all aspects of unusual or uncommon examinations of handwritten items.

1.6 *This standard does not purport to address all of the safety concerns, if any, associated with its use. It is the responsibility of the user of this standard to establish appropriate safety and health practices and determine the applicability of regulatory requirements prior to use.*

2. Referenced Documents

2.1 *Standards:*

ASTM E1732 Terminology Relating to Forensic Science

SWGDOC Standard for Scope of Work of Forensic Document Examiners

SWGDOC Terminology for Expressing Conclusions of Forensic Document Examiners

SWGDOC Terminology Relating to the Examination of Questioned Documents

3. Terminology

3.1 For definitions of terms in this standard, refer to Terminologies E1732 and SWGDOC Terminology Relating to the Examination of Questioned Documents.

3.2 *Definitions:*

3.2.1 *known, n adj*——of established origin associated with the matter under investigation. E1732

3.2.2 *questioned, n adj* —associated with the matter under investigation about which there is some question, including, but not limited to, whether the questioned and known items have a common origin. E1732

3.3 *Definitions of Terms Specific to This Standard:*

3.3.1 *absent character, n*—a character or character combination which is present in one body of writing but is not present (for example, does not have a corresponding character) in another body of writing.

3.3.2 *character, n*—any language symbol (for example, letter, numeral, punctuation mark, or other sign), other symbol, or ornament.

3.3.3 *characteristic, n*—a feature, quality, attribute, or property of writing.

3.3.4 *comparable, n adj*——pertaining to handwritten items that contain the same type(s) of writing and similar characters, words, and combinations. Contemporaneousness and writing instruments may also be factors.

3.3.5 *distorted writing, n*—writing that does not appear to be, but may be natural. This appearance can be due to either voluntary factors (for example, disguise, simulation) or involuntary factors (for example, physical condition of the writer, writing conditions).

3.3.6 *handwritten item, n*—an item bearing something written by hand (for example, cursive writing, hand printing, signatures).

NOTE 1—As used in this standard "handwriting" and "handwritten" are generic terms. Writing is generally, but not invariably, produced using the hand, and may be the result of some other form of direct manipulation of a writing or marking instrument by an individual.

3.3.7 *individualizing characteristics, n*—marks or properties that serve to uniquely characterize writing.

3.3.7.1 *Discussion*—Both class characteristics (marks or properties that associate individuals as members of a group) and individual characteristics (marks or properties that differentiate the individual members in a group) are individualizing characteristics.

3.3.8 *item, n*—an object or quantity of material on which a set of observations can be made.

3.3.9 *natural writing, n*—any specimen of writing executed without an attempt to control or alter its usual quality of execution.

3.3.10 *range of variation, n*—the accumulation of deviations among repetitions of respective handwriting characteristics that are demonstrated in the writing habits of an individual. (See *variation, 3.3.15*).

3.3.11 *significant difference, n*—an individualizing characteristic that is structurally divergent between handwritten items, that is outside the range of variation of the writer, and that cannot be reasonably explained.

3.3.12 *significant similarity, n*—an individualizing characteristic in common between two or more handwritten items.

3.3.13 *sufficient quantity, n*—that amount of writing required to assess the writer's range of variation, based on the writing examined.

Copyright by SWGDOC (all rights reserved) Wed Jun 4 13:16:05 CDT 2015

3.3.14 *type of writing*, *n*—refers to hand printing, cursive writing, numerals, symbols, or combinations thereof, and signatures.

3.3.15 *variation*, *n*—those deviations among repetitions of the same handwriting characteristic(s) that are normally demonstrated in the habits of each writer.

*Discussion*—Since variation is an integral part of natural writing, no two writings of the same material by the same writer are identical in every detail. Within a writer's range of variation, there are handwriting habits and patterns that are repetitive and similar in nature. These repetitive features give handwriting a distinctive individuality for examination purposes. Variation can be influenced by internal factors such as illness, medication, intentional distortion, etc. and external factors such as writing conditions and writing instrument, etc.

4. Significance and Use

4.1 The procedures outlined here are grounded in the generally accepted body of knowledge and experience in the field of forensic document examination. By following these procedures, a forensic document examiner can reliably reach an opinion concerning whether two or more handwritten items were written by the same person(s).

NOTE 2—The phrase "written by the same person(s)" refers to physical generation of the writing, not to intellectual ownership of the content.

5. Interferences

5.1 Items submitted for examination may have inherent limitations that can interfere with the procedures in this Standard. Limitations should be noted and recorded.

5.2 Limitations can be due to submission of non-original documents, limited quantity or comparability, or condition of the items submitted for examination. Other limitations can come from the quantity or comparability of the writing submitted, and include absent characters, dissimilarities, or limited individualizing characteristics. Such features are taken into account in this standard.

5.3 The results of prior storage, handling, testing, or chemical processing (for example, for latent prints) may interfere with the ability of the examiner to see certain characteristics. Whenever possible, document examinations should be conducted prior to any chemical processing. Items should be handled appropriately to avoid compromising subsequent examinations (for example, with clean cloth gloves).

5.4 Consideration should be given to the possibility that various forms of simulations, imitations, and duplications of handwriting can be generated by computer and other means.

6. Equipment and Requirements

6.1 Appropriate light source(s) of sufficient intensity to allow fine detail to be distinguished.

NOTE 3—Natural light, incandescent or fluorescent sources, or fiber optic lighting systems are generally utilized. Transmitted lighting, side lighting, and vertical incident lighting have been found useful in a variety of situations.

6.2 Magnification sufficient to allow fine detail to be distinguished.

6.3 Other apparatus as appropriate.

6.4 Imaging or other equipment for recording observations as required.

6.6 Sufficient time and facilities to complete all applicable procedures.

7. Procedure

7.1 All procedures shall be performed when applicable and noted when appropriate. These procedures need not be performed in the order given.

7.2 Examinations, relevant observations, and results shall be documented.

7.3 At various points in these procedures, a determination that a particular feature is not present or that an item is lacking in quality or comparability may indicate that the examiner should discontinue or limit the procedure(s). It is at the discretion of the examiner to discontinue the procedure at that point and report accordingly or to continue with the applicable procedures to the extent possible. The reasons for such a decision shall be documented.

7.4 Determine whether the examination is a comparison of questioned writing to known writing or a comparison of questioned writing to questioned writing.

7.5 Determine whether the questioned writing is original writing. If it is not original writing, request the original.

NOTE 4—Examination of the original questioned writing is preferable.

7.5.1 If the original is not submitted, evaluate the quality of the best available reproduction to determine whether the significant details of the writing have been reproduced with sufficient clarity for comparison purposes and proceed to the extent possible. If the writing has not been reproduced with sufficient clarity for comparison purposes, discontinue these procedures and report accordingly.

7.6 Determine whether the questioned writing appears to be distorted. If it appears to be distorted, determine whether it is possible to establish that the apparently distorted writing is natural writing.

7.6.1 If it is not natural writing, or if it is not possible to establish whether the apparently distorted writing is natural writing, determine whether the apparently distorted writing is suitable for comparison and proceed to the extent possible. If the available questioned writing is not suitable for comparison, discontinue these procedures and report accordingly.

7.7 Evaluate the questioned writing for the following:

Copyright by SWGDOC (all rights reserved). Wed Jan 14 13:19:06 CDT 2015

7.7.1 *Type of Writing*—If there is more than one type of writing within the questioned writing, separate the questioned writing into groups of single types of writing.

7.7.2 *Internal Consistency*—If there are inconsistencies within any one of the groups created in 7.7.1 (for example, suggestive of multiple writers), divide the group(s) into subgroups, each one of which is consistent.

7.7.3 Determine range of variation of the writing for each group or sub-group of the questioned writing created in 7.7.1 and 7.7.2.

7.7.4 Determine presence or absence of individualizing characteristics.

7.7.5 If the examination is a comparison of exclusively questioned writing, go to 7.12.

7.8 Determine whether the known writing is original writing. If it is not original writing, request the original.

NOTE 5—Examination of the original known writing is preferable.

7.8.1 If the original is not submitted, evaluate the quality of the best available reproduction to determine whether the significant details of the writing have been reproduced with sufficient clarity for comparison purposes and proceed to the extent possible. If the writing has not been reproduced with sufficient clarity for comparison purposes, discontinue these procedures and report accordingly.

7.9 Determine whether the known writing appears to be distorted. If it appears to be distorted, determine whether it is possible to establish that the apparently distorted writing is natural writing.

7.9.1 If it is not natural writing, or if it is not possible to establish whether the apparently distorted writing is natural writing, determine whether the apparently distorted writing is suitable for comparison and proceed to the extent possible. It should be determined whether additional known writing would be of assistance, and if so, it should be requested. If the available known writing is not suitable for comparison, discontinue these procedures and report accordingly.

7.10 Evaluate the known writing for the following:

7.10.1 *Type of Writing*—If there is more than one type of writing within the known writing, separate the known writing into groups of single types of writing.

7.10.2 *Internal Consistency*—If there are unresolved inconsistencies within any of the groups created in 7.10.1 (for example, suggestive of multiple writers), contact the submitter for authentication. If any inconsistencies are not resolved to the examiner's satisfaction, discontinue these procedures for the affected group(s), and report accordingly.

7.10.3 Determine range of variation of the writing for each group of the known writing created in 7.10.1 and 7.10.2.

7.10.4 Determine presence or absence of individualizing characteristics.

7.11 Evaluate the comparability of the bodies of writing (questioned writing to known writing or exclusively questioned writing).

7.11.1 If the bodies of writing are not comparable, discontinue comparison and request comparable known writing, if appropriate.

7.11.1.1 If comparable known writing is made available, return to 7.10. If comparable known writing is not made available, discontinue these procedures and report accordingly.

7.12 Conduct a side-by-side comparison of comparable portions of the bodies of writing.

7.12.1 Determine whether there are differences, absent characters, and similarities.

7.12.2 Evaluate their significance individually and in combination.

7.12.3 Determine if there is a sufficient quantity of writing (questioned writing, or known writing, or both).

7.12.3.1 If writing (questioned writing, or known writing, or both) is not sufficient in quantity for an elimination or an identification, continue the comparison to the extent possible. When appropriate, request more known writing. If more known writing is made available, return to 7.10.

7.12.4 Analyze, compare, and evaluate the individualizing characteristics and other potentially significant features present in the comparable portions of the bodies of writing.

NOTE 6—Among the features to be considered are elements of the writing such as abbreviation; alignment; arrangement, formatting, and positioning; capitalization; connectedness and disconnectedness; cross strokes and dots, diacritics and punctuation; direction of strokes; disguise; embellishments; formation; freedom of execution; handedness; legibility; line quality; method of production; pen hold and pen position; overall pressure and patterns of pressure emphasis; proportion; simplification; size; skill; slant or slope; spacing; speed; initial, connecting, and terminal strokes; system; tremor; type of writing; and range of variation.

Other features such as lifts, stops and hesitations of the writing instrument; patching and retouching; slow, drawn quality of the line; unnatural tremor; and standard lines of various forms should be evaluated when present.

Potential limiting factors such as age; illness or injury; medication, drugs or alcohol (intoxication or withdrawal); awkward writing position; cold or heat; fatigue; haste or carelessness; nervousness; nature of the document, use of the unaccustomed hand; deliberate attempt at disguise or auto-forgery should be considered.

For further details, see the referenced texts.

7.12.5 Evaluate the similarities, differences, and limitations. Determine their significance individually and in combination.

7.13 Form a conclusion based on results of the above analyses, comparisons, and evaluations.

Copyright by SWGDOC Case 3:23-cv-00881-MOC-WCK 14 13:Document 19-1    Filed 10/01/25    Page 48 of 53

## 8. Reporting Conclusions

8.1 The conclusion(s) or opinion(s) resulting from the procedures in this standard may be reached once sufficient examinations have been conducted. The number and nature of the necessary examinations is dependent on the question at hand.

8.2 The bases and reasons for the conclusion(s), or opinion(s), should be included in the examiner's documentation and may appear in the report.

8.3 Refer to SWGDOC Terminology for Expressing Conclusions of Forensic Document Examiners for reporting conclusion(s) or opinion(s).

## 9. Keywords

9.1 forensic sciences; handwriting; questioned documents

## REFERENCES

(1) Conway, J.V.P., *Evidential Documents*, Springfield, IL, Charles C. Thomas, 1959.

(2) Harrison, W.R., *Suspect Documents*, London, Sweet and Maxwell, 1958 and 1966.

(3) Hilton, O., *Scientific Examination of Questioned Documents*, New York, Elsevier, 1982.

(4) Huber, R.A., and Headrick, A.M., *Handwriting Identification: Facts and Fundamentals*, Boca Raton, FL, CRC Press, 1999.

(5) Osborn, A.S., *Questioned Documents*, 2d ed., Albany, NY, Boyd Printing Co., 1929.

Copyrights by SWGDOC, all rights reserved Wed DEC 4 13:20:05 2013

# **Exhibit 3**

# SWGDOC Standard Terminology for Expressing Conclusions of Forensic Document Examiners

## 1. Scope
1.1 This terminology is intended to assist forensic document examiners in expressing conclusions or opinions based on their examinations.
1.2 The terms in this terminology are based on the report of a committee of the Questioned Document Section of the American Academy of Forensic Science that was adopted as the recommended guidelines in reports and testimony by the Questioned Document Section of the American Academy of Forensic Science and the American Board of Forensic Document Examiners.[1]

## 2. Referenced Documents
2.1 *Standards*
SWGDOC Standard for Scope of Work of Forensic Document Examiners

## 3. Significance and Use
3.1 Document examiners begin examinations from a point of neutrality. There are an infinite number of gradations of opinion toward an identification or toward an elimination. It is in those cases wherein the opinion is less than definite that careful attention is especially needed in the choice of language used to convey the weight of the evidence.
3.2 Common sense dictates that we must limit the terminology we use in expressing our degrees of confidence in the evidence to terms that are readily understandable to those who use our services (including investigators, attorneys, judges, and jury members), as well as to other document examiners. The expressions used to differentiate the gradations of opinions should not be considered as strongly defined "categories". These expressions should be guidelines without sharply defined boundaries.
3.3 When a forensic document examiner chooses to use one of the terms defined below, the listener or reader can assume that this is what the examiner intended the term to mean. To avoid the possibility of misinterpretation of a term where the expert is not present to explain the guidelines in this standard, the appropriate definition(s) could be quoted in or appended to reports.
3.4 The examples are given both in the first person and in third person since both methods of reporting are used by document examiners and since both forms meet the main purpose of the standard, that is, to suggest terminology that is readily understandable. These examples should not be regarded as the only ways to utilize probability statements in reports and testimony. In following any guidelines, the examiner should always bear in mind that sometimes the examination will lead into paths that cannot be anticipated and that no guidelines can cover exactly.
3.5 Although the material that follows deals with handwriting, forensic document examiners may apply this terminology to other examinations within the scope of their work, as described in SWGDOC Standard for Scope of Work of Forensic Document Examiners, and it may be used by forensic examiners in other areas, as appropriate.
3.6 *This standard does not purport to address all of the safety concerns, if any, associated with its use. It is the responsibility of the user of this standard to establish appropriate safety and health practices and determine the applicability of regulatory limitations prior to use.*

## 4. Terminology
4.1 *Recommended Terms:*
**identification (definite conclusion of identity)**—this is the highest degree of confidence expressed by document examiners in handwriting comparisons. The examiner has no reservations whatever, and although prohibited from using the word "fact," the examiner is certain, based on evidence contained in the handwriting, that the writer of the known material actually wrote the writing in question.
*Examples*—It has been concluded that John Doe wrote the questioned material, or it is my opinion [or conclusion] that John Doe of the known material wrote the questioned material.
**strong probability (highly probable, very probable)**—the evidence is very persuasive, yet some critical feature or quality is missing so that an *identification* is not in order; however, the examiner is virtually certain that the questioned and known writings were written by the same individual.
*Examples*—There is *strong probability* that the John Doe of the known material wrote the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material *very probably* wrote the questioned material.
DISCUSSION—Some examiners doubt the desirability of differentiating between strong probability and probable, and certainly they may eliminate this terminology. But those examiners who are trying to encompass the entire "gray scale" of degrees of confidence may wish to use this or a similar term.

---

[1] McAlexander T.V., Beck, J., and Dick, R., "The Standardization of Handwriting Opinion Terminology," *Journal of Forensic Science*, Vol 36, No. 2, March 1991, pp. 311–319.

Copyright by SWGDOC (all rights reserved) Wed Dec 04 13:39:05 CDT 2015

**probable**—the evidence contained in the handwriting points rather strongly toward the questioned and known writings having been written by the same individual; however, it falls short of the" virtually certain" degree of confidence.

*Examples*—It has been concluded that the John Doe of the known material probably wrote the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material *probably* wrote the questioned material.

**indications (evidence to suggest)**—a body of writing has few features which are of significance for handwriting comparison purposes, but those features are in agreement with another body of writing.

*Examples*—There is evidence which *indicates* (or *suggests*) that the John Doe of the known material may have written the questioned material but the evidence falls far short of that necessary to support a definite conclusion.

DISCUSSION—This is a very weak opinion, and a report may be misinterpreted to be an identification by some readers if the report simply states, "The evidence *indicates* that the John Doe of the known material wrote the questioned material." There should always be additional limiting words or phrases (such as "may have" or "but the evidence is far from conclusive") when this opinion is reported, to ensure that the reader understands that the opinion is weak. Some examiners doubt the desirability of reporting an opinion this vague, and certainly they cannot be criticized if they eliminate this terminology. But those examiners who are trying to encompass the entire "gray scale" of degrees of confidence may wish to use this or a similar term.

**no conclusion (totally inconclusive, indeterminable)**—This is the zero point of the confidence scale. It is used when there are significantly limiting factors, such as disguise in the questioned and/or known writing or a lack of comparable writing, and the examiner does not have even a leaning one way or another. *Examples*—*No conclusion* could be reached as to whether or not the John Doe of the known material wrote the questioned material, or I could not determine whether or not the John Doe of the known material wrote the questioned material.

**indications did not**—this carries the same weight as the indications term that is, it is a very weak opinion.

*Examples*—There is very little significant evidence present in the comparable portions of the questioned and known writings, but that evidence suggests that the John Doe of the known material did not write the questioned material, or I found indications that the John Doe of the known material did *not* write the questioned material but the evidence is far from conclusive.

See Discussion after indications.

**probably did not**—the evidence points rather strongly against the questioned and known writings having been written by the same individual, but, as in the probable range above, the evidence is not quite up to the "virtually certain" range.

*Examples*—It has been concluded that the John Doe of the known material probably did not write the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material probably did not write the questioned material.

DISCUSSION—Some examiners prefer to state this opinion: "It is unlikely that the John Doe of the known material wrote the questioned material." There is no strong objection to this, as "unlikely" is merely the Anglo-Saxon equivalent of "improbable".

**strong probability did not**—this carries the same weight as strong probability on the identification side of the scale; that is, the examiner is virtually certain that the questioned and known writings were not written by the same individual.

*Examples*—There is strong probability that the John Doe of the known material did not write the questioned material, or in my opinion (or conclusion or determination) it is highly probable that the John Doe of the known material did not write the questioned material.

DISCUSSION—Certainly those examiners who choose to use "unlikely" in place of "probably did not" may wish to use "highly unlikely" here.

**elimination**—this, like the *definite conclusion of identity*, is the highest degree of confidence expressed by the document examiner in handwriting comparisons. By using this expression the examiner denotes no doubt in his opinion that the questioned and known writings were not written by the same individual.

*Examples*—It has been concluded that the John Doe of the known material did not write the questioned material, or it is my opinion (or conclusion or determination) that the John Doe of the known material did not write the questioned material.

DISCUSSION—This is often a very difficult determination to make in handwriting examinations, especially when only requested exemplars are available, and extreme care should be used in arriving at this conclusion.

4.1.1 When the opinion is less than definite, there is usually a necessity for additional comments, consisting of such things as reasons for qualification (if the available evidence allows that determination), suggestions for remedies (if any are known), and any other comments that will shed more light on the report. The report should stand alone with no extra explanations necessary.

4.2 *Deprecated and Discouraged Expressions*:

4.2.1 Several expressions occasionally used by document examiners are troublesome because they may be misinterpreted to imply bias, lack of clarity, or fallaciousness and their use is deprecated. Some of the terms are so

Copyright ® SWGDOC. All rights reserved.

blatantly inane (such as "make/no make") that they will not be discussed. The use of others is discouraged because they are incomplete or misused. These expressions include:

**possible/could have**—these terms have no place in expert opinions on handwriting because the examiner's task is to decide to what degree of certainty it can be said that a handwriting sample is by a specific person. If the evidence is so limited or unclear that no definite or qualified opinion can be expressed, then the proper answer is *no conclusion*. To say that the suspect "could have written the material in question" says nothing about probability and is therefore meaningless to the reader or to the court. The examiner should be clear on the different meanings of "possible" and "probable," although they are often used interchangeably in everyday speech.

**consistent with**—there are times when this expression is perfectly appropriate, such as when "evidence consistent with disguise is present" or "evidence consistent with a simulation or tracing is present, but "the known writing is consistent with the questioned writing" has no intelligible meaning.

**could not be identified/cannot identify**—these terms are objectionable not only because they are ambiguous but also because they are biased; they imply that the examiner's task is only to identify the suspect, not to decide whether or not the suspect is the writer. If one of these terms is used, it should always be followed by "or eliminate[d]".

**similarities were noted/differences as well as similarities**— these expressions are meaningless without an explanation as to the extent and significance of the similarities or differences between the known and questioned material. These terms should never be substituted for gradations of opinions.

**cannot be associated/cannot be connected**—these terms are too vague and may be interpreted as reflecting bias as they have no counterpart suggesting that the writer cannot be eliminated either.

**no identification**—this expression could be understood to mean anything from a strong probability that the suspect wrote the questioned writing; to a complete elimination. It is not only confusing but also grammatically incorrect when used informally in sentences such as. "I no identified the writer" or "I made a no ident in this case."

**inconclusive**—this is commonly used synonymously with no conclusion when the examiner is at the zero point on the scale of confidence. A potential problem is that some people understand this term to mean something short of definite (or conclusive), that is, any degree of probability, and the examiner should be aware of this ambiguity.

**positive identification**—This phrase is inappropriate because it seems to suggest that some identifications are more positive than others.

**[strong] reason to believe**—there are too many definitions of *believe* and *belief* that lack certitude. It is more appropriate to testify to our conclusion (or determination or expert opinion) than to our belief, so why use that term in a report?

**qualified identification**—An *identification* is not qualified. However, opinions may be qualified when the evidence falls short of an *identification* or *elimination*.

Copyright © 2013 by SWGDOC. All rights reserved.