STATE OF SOUTH CAROLINA )    **BEFORE THE SOUTH CAROLINA**

COUNTY OF GREENVILLE )    **WORKERS' COMPENSATION COMMISSION**

   )

Sonji McKinney, )

   Employee, )    **AGREEMENT AND FINAL RELEASE**

   Claimant, )    W.C.C. FILE NO. 1510391

   )    CARRIER FILE NO. 002223-016056-WC-01

-vs- )

   )

Magna Drive Automotive, )

   Employer, )

and American Zurich Insurance Company, )

   Carrier, )

   Defendants. )

   )

---

This matter now comes before the South Carolina Workers' Compensation Commission upon the petition of the claimant, Sonji McKinney. The claimant is represented by Russell F. Guest, Esquire, and the defendants, Magna Drive Automotive and American Zurich Insurance Company, are represented by J. South Lewis, II, Esquire of Willson Jones Carter & Baxley, P.A. The South Carolina Workers' Compensation Commission has jurisdiction. The parties agree that venue is proper in Greenville County, South Carolina. Claimant's compensation rate is Seven Hundred Sixty-six and 05/100 (maximum compensation rate for 2015) Dollars ($766.05).

It appears that the claimant was an employee of Magna Drive Automotive and that on July 17, 2015, she sustained an injury by accident, arising out of and in the course of said employment, when she was struck by a forklift while working at the Kimura warehouse. Claimant alleges that as a result of the incident, she sustained injury to her back, bilateral legs, bilateral shoulders, and psychological overlay. Defendants have admitted injury only to the back/neck, and deny injury to any additional body parts, including but not limited to the psychological allegation. The parties acknowledge that Defendants continue to deny injury to any additional body parts, other than the

back/neck, and that this settlement is on a doubtful and disputed basis as it relates to any additionally alleged body parts.

As a result of this alleged accident, Claimant sought and received medical treatment from Dr. J. Kelby Hutcheson (Carolina Center for Advanced Management of Pain), and Dr. Charles Kanos (Southeastern Neurosurgical & Spine). Dr. Kanos determined that the claimant reached maximum medical improvement (MMI) on January 8, 2016, and rendered a five percent (5%) impairment to the cervical spine. Dr. Hutcheson also opined (in his deposition) that the claimant had reached MMI, but did not assign an impairment rating.

The parties hereto now advise that in their opinion the matter is in bona fide dispute and in view of such dispute an agreement has been reached to settle this matter in its entirety, subject to the approval of the South Carolina Workers' Compensation Commission.

Under the proposed settlement the defendants have agreed to pay and the claimant has agreed to accept the total final settlement sum of Fifty Thousand and 00/100 Dollars ($50,000.00) in full settlement and satisfaction of every liability of whatsoever nature or kind under the South Carolina Workers' Compensation Act growing out of, or in any way connected with, said alleged work accident occurring on or about July 17, 2015, while the claimant was an employee of Magna Drive Automotive. As an integral part of this settlement agreement, it is expressly understood and agreed the defendants shall be responsible for medicals with authorized treating physicians [for the back/neck only] through February 10, 2017, and that any and all other medical expenses of whatsoever nature or kind shall be the express liability of the claimant and the defendants shall have no liability therefore. Claimant acknowledges that Defendants are not responsible for any of the "unauthorized" medical treatment she obtained, including but not limited to, Dr. Gupta, Carolina Center for Behavioral Health and any and all other unauthorized providers. Claimant fully understands and acknowledges that the payment of the sum of Fifty Thousand and 00/100 Dollars ($50,000.00) represents the full and final settlement. Defendants agree to waive any statutory lien(s) on third-party recovery Claimant may obtain from Kimura, or other alleged at-fault parties, related to the July 17, 2015 incident.

The Claimant's net proceeds of Twenty-seven Thousand, Nine Hundred Sixty-seven and 69/100 Dollars ($27,967.69) from the foregoing lump sum settlement, ($50,000.00 less attorney's fees of $16,666.67, less costs of $5,365.64 equaling $27,967.69 net proceeds to Claimant) shall be prorated based on the Claimant's current age of Forty One (41). S.C. Code Ann. § 19-1-150 (1976, as amended), yields a life expectancy of 41.05 years (2134.60 weeks). Therefore, the Claimant's net proceeds of $27,967.69 shall be prorated at the rate of $13.102075 per week. James v. Anne's Inc., 386 S.C. 326, 688 S.E.2d 562 (2010), *rev'd on reh'g,* 390 S.C. 188, 701 S.E.2d 730 (2010); Social Security Program Operations Manual System DI 52001.555(4) (f/k/a Utica-Mohawk Mills v. Orr, 227 S.C. 226, 87 S.E.2d 589 (1955).

It is expressly understood that defendants take no position and make no representation as to the requested allocation of the settlement sum as set forth above and that the proposed allocation in no way affects the absolute release of defendants.

The claimant hereby asserts that she has been fully advised by her attorney of record of all her rights under the South Carolina Workers' Compensation Act, and that the claimant is of the opinion that the proposed settlement is reasonable and fair and in this opinion the claimant's attorney concurs and asserts that he has fully advised the claimant of all her rights under the South Carolina Workers' Compensation Act, and they respectfully request that this Commission approve the settlement as set forth above. The claimant hereby asserts that she recognizes that her consent to, and the approval of, this Agreement and Final Release is a final determination and adjudication of all benefits under the South Carolina Workers' Compensation Act growing out of, or in any way connected with, the aforesaid alleged work accident occurring on or about July 17, 2015, while the claimant was an employee of Magna Drive Automotive.

Claimant hereby affirms that she has not applied for and is not receiving Social Security disability, is not on Medicare, is not enrolled in Medicare Advantage, and is not aware of any Medicare liens. The parties expressly agree that the claimant does not have a reasonable expectation of Medicare eligibility within 30 months from the date of this settlement. The parties have taken into consideration Medicare's potential interest in the resolution of this claim. The

parties agree that a Medicare Set-Aside will not be submitted to CMS for review and/or approval. Claimant has been advised of the potential risks associated with not establishing a Medicare Set-Aside account and not submitting a Medicare Set-Aside to CMS for review and/or approval, including but not limited to, CMS/Medicare's potential withholding of Medicare benefits to the claimant.

Claimant also expressly represents and agrees that she sustained no work accidents or work injuries while employed by Magna Drive Automotive other than the work accident and resulting injury occurring on or about July 17, 2015.

The parties hereto acknowledge that the South Carolina Workers' Compensation Commission relies upon the representation of the attorney for the claimant that the claimant has been fully apprised of her rights under the South Carolina Workers' Compensation Act.

The parties acknowledge that the opinions stated by the physicians regarding the nature and extent of the employee's medical condition and disability are opinions, not facts, and that, to the extent they are relying on those opinions, they are doing so with the knowledge that such opinions may be incorrect. Accordingly, employee, employer and carrier and/or servicing agent agree that this settlement agreement cannot be voided in the future for any reason, including on the basis that either or both parties relied on statements or opinions from physicians, or other medical providers, in entering into this agreement.

Claimant does hereby acknowledge that the Defendants have fully, finally, and completely paid and discharged each and every one of their obligations, liabilities, and responsibilities under the South Carolina Workers' Compensation Act and that said sum is being paid in full and final satisfaction of all claims whatsoever arising from the alleged work accident occurring on or about July 17, 2015. Claimant enters into this Agreement and Final Release freely and voluntarily, without undue influence, coercion, or duress.

NOW, THEREFORE, IT IS AGREED, SETTLED, APPROVED, and ORDERED that upon the payment of the sum of Fifty Thousand and 00/100 Dollars ($50,000.00) by the defendants, and the acceptance of said sum by the claimant, and the payment of the medical expenses as

specifically set forth hereinabove, the defendants be, and they hereby are, fully and forever discharged of all liability, obligations and/or responsibilities of whatsoever nature and kind under the South Carolina Workers' Compensation Act growing out of, or in any way connected with, the aforesaid alleged work accident occurring on or about July 17, 2015, while the claimant was an employee of Magna Drive Automotive, so that upon such payment and the acceptance as aforesaid, this matter be, and it hereby is, res judicata and not subject to review under any conditions. Claimant enters into this Agreement and Final Release freely and voluntarily, without undue influence, coercion, or duress of any kind.

*I did not voluntary Sign to a clinches*

WE CONSENT TO THE FOREGOING
AGREEMENT:

_____
Sonji McKinney, Claimant

Dated: _____

_____
Russell F. Guest
Attorney for Claimant

WILLSON JONES CARTER & BAXLEY, P.A.

BY: _____
J. South Lewis, II
Attorneys for Defendants

*I was told to just sign and they would take care of everything! I trusted them!*

STATE OF SOUTH CAROLINA      )
                             )
COUNTY OF GREENVILLE         )

## SEPARATION AGREEMENT AND RELEASE OF CLAIMS

THIS AGREEMENT is made and entered into by and between **Sonji McKinney** and **Magna Drive Automotive**.

THE PARTIES acknowledge the following:

"EMPLOYEE" refers to Sonji McKinney.

"COMPANY" refers to Magna Drive Automotive, as well as any parent, affiliated or related companies, subsidiaries, or divisions, and the officers, directors, employees and agents of them.

EMPLOYEE and the Company agree that effective February 10, 2017, Employee shall be considered to have resigned from her position with the Company, and this Agreement will become effective as set forth below.

THEREFORE, in consideration of the mutual agreements and promises set forth within this Agreement, the receipt and sufficiency of which are hereby acknowledged and, provided that Employee properly executes and returns it to counsel for the Company and does not revoke it as set forth below, Employee and the Company agree as follows:

1.     Consideration

      A.     In consideration of Employee's agreements and promises set forth below, the Company will pay Employee One Hundred and 00/100 Dollars ($100.00), the receipt and sufficiency of which are hereby acknowledged. As additional consideration, the Company will pay Claimant's COBRA premiums (Silver Plan for employee coverage only, not a family plan), should she elect for COBRA coverage, for a period of eight months after her termination date. The parties acknowledge the Company's agreement to pay eight months of COBRA premiums is not on the basis of any disability or admission that Employee is disabled, but merely additional consideration for entering this Separation Agreement. After the Company has discharged its obligations of paying eight months COBRA premiums, should the employee elect to continue COBRA coverage, she will be solely responsible for any premiums due, pursuant to the regular terms of the plan.

      B.     As additional valuable and sufficient consideration to support Employee's agreements and promises, the Company agrees to release Employee from any claims which it has or might have against her, including but not limited to any claims for attorneys' fees and costs.

2.     Legal Obligations

The parties agree that the Company has no prior legal obligations to make the payment or promises described in paragraph 1 which are exchanged for the agreements and promises of Employee herein.

3. <u>Release of Claims and Covenant Not to Sue</u>

A.   In exchange for the Company's agreement to provide the above payment, Employee agrees <u>not</u> to make any claims or demands or to commence any lawsuits against the Company on any matters arising from or related in any way to the Employee's employment with or termination from the Company.

This includes, but is not limited to, a release of any and all rights arising under any state or federal constitution, statute, law, rule, regulation, or common law principle of tort, contract, or equity.

In further consideration of the foregoing, receipt of which is hereby acknowledged, Employee, for herself and her current or future spouse or children, heirs, executors, administrators, grantees, and successors forever discharges Company, and its predecessors, insurers, indemnitors, purchasers, successors and assigns, from all manner of actions, causes of action, suits, debts, accounts, judgments, claims and demands whatsoever, in law and/or in equity arising out of or in any way related to Employee's hiring, employment, wages, commissions, bonuses, benefits, compensation, request for or to return from leave of absence, demotion, resignation, discharge, termination, severance or termination benefits, and/or terms and conditions of employment; any and all causes of action for harassment, retaliation, breach of contract, breach of implied contract, tortious interference with contract, wrongful transfer or demotion, wrongful termination, fraud, negligence, libel or slander, intentional or negligent infliction of emotional distress, breach of confidentiality, invasion of privacy, or any other rights, claims, or causes of action arising under any state or federal constitution, statute, law, rule, regulation, or common law principle of tort, contract, or equity.

This specifically includes, but is not limited to, a release of any and all rights, claims, and causes of action of any sort arising under the Age Discrimination in Employment Act of 1967, 29 U.S.C. §621, <u>et</u> <u>seq.</u>; Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000, <u>et</u> <u>seq.</u>; the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, <u>et</u> <u>seq.</u>; the Americans with Disabilities Act, 42 U.S.C. § 12101, <u>et</u> <u>seq.</u>; the South Carolina statute prohibiting workers' compensation retaliation, S.C. Code Ann. § 41-1-80; the South Carolina Human Affairs Law, S.C. Code Ann. § 1-13-10, <u>et</u> <u>seq.</u>; National Labor Relations Act, 29 U.S.C. §151, <u>et</u> <u>seq</u>; Civil Rights Act of 1866, 42 U.S.C. § 1981; Fair Labor Standards Act, 29 U.S.C. §201, <u>et</u> <u>seq.</u>; Employee Retirement Income Security Act, 29 U.S.C. § 1001, <u>et</u> <u>seq.</u>; the South Carolina wage payment statute, S.C. Code Ann. §41-10-10, <u>et</u> <u>seq.</u>; and the South Carolina Workers' Compensation statutes, §42-1-10, <u>et</u> <u>seq.</u>, §44-30-10, <u>et</u> <u>seq.</u>, of the South Carolina Code, Vocational Rehabilitation Act of 1973; 29 U.S.C. §790 <u>et</u> <u>seq.</u>, or any other legal theory or cause of action, regardless of type, character or form, she may have; any and all causes of action, whether in law and/or in equity, for any expense, reinstatement, loss, mental or physical injury, costs, attorneys' fees, mental anguish, pain and suffering, medical bills or costs, physical or mental impairment, damage to reputation, loss of enjoyment of life, loss of consortium, lost earnings or profits, lost wages or commissions, lost bonuses, lost seniority or retirement benefits, other lost employment benefits including, but not limited to, vacation, or holiday pay and long or short term disability, or any other damage (whether actual, compensatory, punitive, treble or otherwise)

- 2 -

suffered or which may be suffered by Employee due to any event which occurred prior to the date of this Settlement Agreement and Release.

B.     Employee further expressly agrees that this Agreement may be treated as a complete defense to any action or proceeding that may be brought by Employee, or in Employee's behalf, against the Company (as well as any related companies or subsidiaries and the directors, officers, employees, insurers, and agents of them) for relief or damages of any kind arising from Employee's employment or termination from employment with the Company.

C.     Employee acknowledges that this agreement and release is intended to bar claims under the Age Discrimination In Employment Act.

4.     Re-Employment Rights Waived

Employee agrees to waive any rights to reinstatement or reemployment with the Company. Employee agrees, warrants and promises that she will never apply for or, in any way, seek a job or any type of employment with Company at any time in the future. In the event Employee applies for or otherwise seeks employment with Company, Employee agrees that Company may, in its sole, total and only judgment, refuse to hire or otherwise refuse to give Employee a job or employment. The parties specifically intend that this Paragraph 4 survive and apply to acts beyond the date of this Settlement Agreement and Release.

5.     Tax Liability

The parties agree that Employee is responsible for any and all federal or state tax liability (including, but not limited to, taxes, fines, penalties, and interest) which could arise as a result of the aforementioned monetary payment.

6.     Performance

Employee understands and agrees that the Company's obligation to perform under this Agreement is conditioned upon Employee's agreements and promises to the Company as set forth herein. In the event that a court of competent jurisdiction determines that Employee has breached any such agreements or promises, or caused any such agreements or promises to be breached, the Company's obligations to perform under this Agreement shall automatically terminate, and the Company shall have no further obligation to Employee. In addition, the Company may seek injunctive relief to enforce the provisions of this Agreement and may recover reasonable costs and attorneys' fees incurred as a result of such breach.

7.     Successors and Assigns

This Agreement shall inure to and be binding upon the parties hereto, their respective heirs, legal representatives, successors, and assigns.

8.     Governing Law

This Agreement shall be construed in accordance with the laws of the State of South Carolina and applicable federal law.

9.     No Admission of Wrongdoing

Employee understands that the Company does not in any way admit any liability or wrongdoing regarding employee's employment and/or separation from the Company.

- 3 -

10.    Confidentiality

Employee agrees not to disclose the terms and conditions of this Agreement to anyone except: (a) her attorneys; (b) her spouse; (c) her accountant/tax preparer; or (d) as required by law. Employee shall not disclose any terms or conditions to any employee of the Company.

11.    Entire Agreement; Modification

This Agreement constitutes the entire understanding of the parties, and no representation, promise, or inducement not included herein shall be binding upon the parties. Employee affirms that the only consideration for the signing of this Agreement is the terms set forth above and that no other promises or assurances of any kind have been made to Employee by the Company or any other entity or person as an inducement for Employee to sign this Agreement. This Agreement may not be changed orally, but only by an agreement in writing signed by the parties or their respective heirs, legal representatives, successors, and assigns.

12.    Partial Invalidity

The parties agree that the provisions of this Agreement shall be deemed severable and that the invalidity or unenforceability of any portion or any provision shall not affect the validity or enforceability of the other portions or provisions. Such provisions shall be appropriately limited and given effect to the extent that they may be enforceable.

13.    Revocation

The Employee understands that she has or may have a right to assert a claim against the Company under the Age Discrimination Employment Act and voluntarily waives any right to do so. The Employee acknowledges that the Company is not required, by either written policy or by practice, to pay the Employee the monies or provide the other consideration specified above. The Employee understands that she has the right to consult an attorney prior to signing this document and the Employee has at least twenty-one (21) days in which to consider whether to sign this document.

Employee understands that this Agreement may be revoked by Employee within seven (7) days after signing of the Agreement. To revoke the Agreement, Employee must notify the Company, in writing, that Employee desires to revoke the Agreement immediately. This Agreement does not become enforceable until seven (7) days after Employee signs it.

14.    Acknowledgement

**EMPLOYEE AFFIRMS THAT:**

**A.    SHE HAS CAREFULLY READ THIS ENTIRE AGREEMENT AND RELEASE OF CLAIMS.**

**B.    SHE POSSESSES SUFFICIENT EDUCATION AND/OR EXPERIENCE TO FULLY UNDERSTAND THE EXTENT AND IMPACT OF THIS AGREEMENT.**

**C.    SHE HAS BEEN AFFORDED THE OPPORTUNITY TO CONSIDER IT FOR A PERIOD OF TWENTY-ONE (21) DAYS.**

**D.    SHE HAS BEEN AFFORDED THE OPPORTUNITY TO CONSULT AN ATTORNEY BEFORE EXECUTING THIS AGREEMENT.**

- 4 -

E.    SHE IS FULLY COMPETENT TO EXECUTE THIS AGREEMENT AND RELEASE OF CLAIMS AND THAT SHE DOES SO VOLUNTARILY AND WITHOUT ANY COERCION, UNDUE INFLUENCE, THREAT, OR INTIMIDATION OF ANY KIND OR TYPE.

As to Employee:

_____    _____      _____
Date            Sonji McKinney                   Witness

_____    _____      _____
Date            Russell F. Guest              Witness
                Attorney for Employee

For the Company:                   Magna Drive Automotive

_____                          By:_____
Date                                 Craig Lane, General Manager

✳ Sherri Crowe and I became best friends in 2015-2024! She said sign and none of these documents were explained to me! I trusted her!

- 5 -

**Sherry Crowe**

| | |
|---|---|
| **From:** | Sherry Crowe |
| **Sent:** | Tuesday, October 11, 2016 1:09 PM |
| **To:** | Catina Wideman |
| **Subject:** | RE: Daryl Stephens/Sonja McKinney |

Not a problem at all, I appreciate you taking the time to try to help me, in the mist of all that you have going on with your audit. I hope you pass with flying colors.

Thanks-
Sherry Crowe

**From:** Catina Wideman [mailto:cwideman@kimurainc.com]
**Sent:** Tuesday, October 11, 2016 1:06 PM
**To:** Sherry Crowe <sherrycrowe@guestbrady.com>
**Subject:** RE: Daryl Stephens/Sonja McKinney

Sorry that it took so long, still working through this audit!!! I appreciate your patience.

**From:** Sherry Crowe [mailto:sherrycrowe@guestbrady.com]
**Sent:** Tuesday, October 11, 2016 1:05 PM
**To:** Catina Wideman <cwideman@kimurainc.com>
**Subject:** RE: Daryl Stephens/Sonja McKinney

I greatly appreciate your help in this matter, I will forward your email to the Attorney to see if there is anything else we need.

Thanks-
Sherry Crowe

**From:** Catina Wideman [mailto:cwideman@kimurainc.com]
**Sent:** Monday, October 10, 2016 4:44 PM
**To:** Sherry Crowe <sherrycrowe@guestbrady.com>
**Subject:** FW: Daryl Stephens/Sonja McKinney

Hi Sherry,

Apparently the footage only goes back 90 days. Sorry I couldn't be of more help.

Thanks

**From:** Catina Wideman [mailto:cwideman@kimurainc.com]
**Sent:** Monday, October 10, 2016 12:36 PM
**To:** 'Angela Perry' <angela.perry.ki@gmail.com>; 'Sandra Kuzma' <skuzma@kimurainc.com>
**Subject:** RE: Daryl Stephens/Sonja McKinney

Thanks Angie,

Well I think we've done all we can do as far as being diligent.

**From:** Angela Perry [mailto:angela.perry.ki@gmail.com]
**Sent:** Monday, October 10, 2016 12:35 PM
**To:** Catina Wideman <Cwideman@kimurainc.com>; Sandra Kuzma <skuzma@kimurainc.com>
**Subject:** Daryl Stephens/Sonja McKinney

I asked Lee if he could pull footage from that day, he said it only went back 90 days
I went to where I know some are saved, but Dan started that when he came, so there was not one.
Robert Moore was our manager at the time and he is no longer with the company.
Melinda was actually out on leave during that time. She was out from 6/15/2015---7/27/2015.
I am not sure who handled it, like I said, they did not include me in it and I wasn't even sure what all had happened until it was over.
I don't know where else to look.


--
Angela Perry
Human Resources Coordinator
Kimura Inc.
Office: 864-991-3189 ext 220
Cell 864-360-9015

**Sherry Crowe**

| | |
|---|---|
| **From:** | Sherry Crowe |
| **Sent:** | Tuesday, October 4, 2016 11:07 AM |
| **To:** | CWideman@kimurainc.com |
| **Subject:** | Subpoena we mailed on 9/15/16 |
| **Attachments:** | 20161003163544513.pdf |

**Importance:** High

Ms. Wideman here is the subpoena that we mailed to Kimura on 9/15/16. Sonji McKinney (employee of Drive/Magna) was hit by a forklift while inspecting parts in your facility on 7/17/2015. Please let me know if you can help me with these requests or if you can point me in the proper direction. I greatly appreciate your assistance in this matter.
Thanks-
Sherry Crowe
Paralegal to Russell Guest



**Guest & Brady**
ATTORNEYS AT LAW

)00 East North Street, Suite 210
Greenville, South Carolina 29601
Telephone: (864) 233-7200
Facsimile: (864) 242-3667
www.guestbrady.com
Visit Our New Website: *www.guestbrady.com*

NOTE: THE MATERIAL TRANSMITTED AND COMMUNICATED HEREIN IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED, AND MAY CONTAIN INFORMATION THAT IS ATTORNEY PRIVILEGED, CONFIDENTIAL, AND EXEMPT FROM DISCLOSURE UNDER THE APPLICABLE LAW. If the reader of this communication is not the intended recipient, or the employee or agent responsible for delivering this communication to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone (864-233-7200) and delete this email from your files. Regarding any attachment to this email: you MUST notify our offices if you make any changes to the document attached. Guest & Brady, LLC, declares that there is no final or official document except that which is printed from files resident on our computers.

South Carolina Workers' Compensation Commission
1333 Main Street, Suite 500
P.O. BOX 1715
Columbia, SC 29202-1715
803-737-5675



WCC File #: __1510391__
Carrier File #: _____
Carrier Code #: _____
Employer FEIN #: _____

Claimant's Name: __Sonji McKinney__    SSN: __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__    Employer's Name: __Magna/ Drive Automotive__

Address: __PO Box 31__      Address: __600 Wilshire Drive__

City: __Simpsonville__    State: __SC__   Zip: __29681__    City: __Troy__    State: __MI__   Zip: __48084__

Home Phone: __( 864 ) 757 - 9488__    __(   )   -__    Insurance Carrier: __America Zurich Ins Co. Zurich North America__

Preparer's Name: __Russell F. Guest__    Law Firm: __Guest & Brady, LLC__    Preparer's Phone #: __( 864 ) 233 - 7200__

## SUBPOENA

**To:**    **Kimura, Inc.**
**102 Cherry Blossom Dr.**
**Laurens, SC  29360**

☐   **YOU ARE COMMANDED** to appear before the above-named Commission at the place, date and time specified below to testify in the above case.

PLACE OF TESTIMONY: _____      ROOM: _____

☐   **YOU ARE COMMANDED** to appear at the place, date and time specified below to testify at the taking of a deposition in the above case.

PLACE OF DEPOSITION: _____      DATE AND TIME: _____

☒   **YOU ARE COMMANDED** to produce and permit inspection and copying of the following documents or objects in your possession, custody or control at the place, date and time specified below.

LIST OF DOCUMENTS:    **See Attached List**

PLACE:    __Guest & Brady, LLC__      DATE AND TIME:   **Sept. 30, 2016 at 1:00pm**

☐   **YOU ARE COMMANDED** to permit inspection of the following premises at the date and time specified below.

PREMISES: _____      DATE AND TIME: _____

---

*THIS SUBPOENA SHALL REMAIN IN EFFECT UNTIL YOU ARE GRANTED PERMISSION TO DEPART BY THE COMMISSIONER OR AN OFFICER ACTING ON BEHALF OF THE COMMISSIONER. QUESTIONS CONCERNING THIS SUBPOENA SHOULD BE ADDRESSED TO THE FOLLOWING ISSUING OFFICER.*

__Russell F. Guest__
ISSUING OFFICER'S SIGNATURE AND TITLE

__( 864 ) 233 - 7200__
PHONE NUMBER

__September 15, 2016__
DATE

---

Serve this form according to R.67-211(C). Refer to R.67-211 and R.67-214 for additional information. Procedural questions may be addressed to the Judicial Department at 803-737-5675.

WCC Form # 27
Rev. 3/2014

## 27

SUBPOENA

# ADDENDUM TO FORM 27
## Sonji McKinney vs. Magna/Drive Automotive

A) The entire investigation file for incident that occurred on your property on 7/17/2015 involving employee of Magna/Drive Automotive Sonji McKinney being hit by a forklift driven by your Employee Daryl O. Stephens

B) Corrective actions taken for your employee Daryl Stephens;

C) Statements from witnesses of this accident;

D) All literature regarding accidents on the job or reporting accidents on the job given or shown to your employee;

E) All First Report of Injury Forms 12-A;

F) All drafts of the form 12-A;

G) OSHA log for DOA:

H) OSHA log of work related injuries and injuries for DOA;

I) All OSHA forms regarding the claimant; and

J) All surveillance videos tapes and pictures of the surrounding area at the time of this accident from 1:00 a.m. to 3:00 a.m.

1

BEFORE THE SOUTH CAROLINA
WORKERS' COMPENSATION COMMISSION
W.C.C. #1510391

Sonji McKinney,                              )
                                             )
              Employee/Claimant,             )
                                             )
versus                                       )
                                             )
Magna/Drive Automotive and                   )
American Zurich Insurance Company,           )
                                             )
     Employer/Insurer/Defendant.             )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
DEPOSITION OF
ANGUS ALEXANDER CRUICKSHANK
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

     Pursuant to Notice of Deposition and/or agreement
in the above-entitled case, the deposition of ANGUS
ALEXANDER CRUICKSHANK was taken on the 1st day of February,
2017, commencing at the hour of 9:59 a.m., in the offices
of Willson Jones Carter & Baxley, Attorneys at Law,
Greenville, South Carolina.

Reported by:  Rosalind Poole Walters, CVR-M


LEGAL EAGLE
Certified Verbatim Reporters
Post Office Box 5682
Greenville, South Carolina  29606
(864) 298-0082 or (864) 467-1373
depos@legaleagleinc.com

## Deposition of Angus Alexander Cruickshank

**2**

```
    APPEARANCES:

        RUSSELL F. GUEST, ESQUIRE
        GUEST & BRADY, LLC
        900 East North Street, Suite 210
        Greenville, South Carolina 29601
            Attorney for the Claimant,

        J. SOUTH LEWIS, II, ESQUIRE
        WILLSON JONES CARTER & BAXLEY, P.A.
        872 S. Pleasantburg Drive
        Greenville, South Carolina 29607
            Attorney for the Defendant.

    Also attending:  Ms. S. McKinney
```

**4**

```
 1   STIPULATIONS:
 2   It is agreed by and between the counsel for the parties as
 3   follows:
 4   1.  That this deposition is being taken pursuant to all
 5       applicable rules of the South Carolina Workers'
 6       Compensation Commission;
 7   2.  That the deponent waives the right to read and sign the
 8       deposition transcript.
 9           *****   *****   *****   *****
10   ANGUS ALEXANDER CRUICKSHANK, being duly sworn to tell the
11   truth, the whole truth, and nothing but the truth of his own
12   knowledge concerning the matter herein, testified as
13   follows:
14           *****   *****   *****   *****
15   EXAMINATION BY MR. GUEST:
16   Q.  Angus?
17   A.  Yes.
18   Q.  Is it okay if I call you Angus?
19   A.  Definitely.  Please do.
20   Q.  I know we met right before this started, but, again, my
21       name is Russell Guest.  Have you ever taken a
22       deposition before?
23   A.  I did once previously.
24   Q.  And what was the nature of that?
25   A.  It was with Drive Automotive, and I'm trying to
```

**3**

```
                        INDEX
    Stipulations, Waiver and Oath.............................. 4
    Examination by Mr. Guest.................................. 23
    Certificate of reporter.................................. 43

    Exhibits:
    Plaintiff's Exhibit 1, 5 pg.; job description........... 23
    Plaintiff's Exhibit 2, 1 pg.; e-mail.................... 35
    Plaintiff's Exhibit 3, 1 pg.; e-mail.................... 38
```

```
    (This transcript may contain quoted material.  Such
material is reproduced as read or quoted by the speaker.)
```

**5**

```
 1       remember the details.
 2   Q.  Do you remember, was it a workers' comp claim?
 3   A.  It may have been.  It was five years ago.
 4   Q.  I see.
 5   A.  Yeah, it was a good while ago.
 6   Q.  So it's okay.  I don't have to know the details of
 7       that, but really what I'm getting to is that there are
 8       certain procedures that we're going to try to follow
 9       during this thing that we call a deposition.  So what's
10       happening at the moment is Ms. Walters here is taking
11       down all that we say.
12   A.  Okay.
13   Q.  And so it's important to be able to speak up.  Nods she
14       can't really hear.
15   A.  I understand, yeah.
16   Q.  Naturally, also, as we have conversation we talk over
17       one another.  Let's try not to do that.  Let me finish
18       my question, and then I'll let you answer.
19   A.  Okay.
20   Q.  So before you start to answer just let me finish my
21       question.  You might anticipate what I'm going to say.
22   A.  Yeah, I understand.
23   Q.  Okay.  If you ever have to get up, take a break, please
24       do.  This is not an endurance contest.  I'm hopeful
25       that it's not going to take a long time.
```

2 (Pages 2 to 5)

LEGAL EAGLE
864-298-0082

Case 3:25-cv-00681-MOC-DCK    Document 27-5    Filed 10/03/25    Page 17 of 27

Deposition of Angus Alexander Cruickshank

**6**

1   A.  Okay, yeah.
2   Q.  If I ask a question and you answer it, we take it as
3       that you understood the question.  Okay?
4   A.  Okay.
5   Q.  If you don't understand my question because I worded it
6       poorly or I asked something that you just don't
7       understand the way I've asked it, then ask me to
8       rephrase the question.
9   A.  Okay.
10  Q.  I'll be happy to do that.
11  A.  Sure.
12  Q.  So let's just state your full name for the record,
13      please.
14  A.  Angus Alexander Cruickshank.
15  Q.  And I see that you have a shirt on now that says Magna
16      on it.
17  A.  Yes.
18  Q.  Is that correct?
19  A.  Yes.
20  Q.  So you work for a company called Magna?
21  A.  Yes.
22  Q.  And I know it's an international company.
23  A.  Yes.
24  Q.  Do they have different names for the local--
25  A.  Every plant has its unique name, like Drive Automotive,

**7**

1       but we all fall under the Magna, I guess it's the Magna
2       flagship, the Magna company.
3   Q.  So if I refer to Magna during the course of this, I'm
4       mostly speaking about the local --
5   A.  Understood.
6   Q.  -- production facility.
7   A.  Understood.
8   Q.  And where is that located?
9   A.  It's down the road in Moonville.
10  Q.  In Moonville.  And do you know what county that's in?
11  A.  I assume Piedmont, or is it -- I don't know.  To be
12      honest, I'm a Canadian who transferred down here.
13      Maybe it's Greenville County.  I don't know.
14  Q.  That's okay.  What is your job title at Magna?
15  A.  Currently I'm an assistant general manager over
16      assembly.
17  Q.  Have you reviewed any documents in preparation for this
18      deposition?
19  A.  Not really, to be honest.  If I can -- I want to say
20      no, but I don't really have any documents to review in
21      relation to Sonji.
22  Q.  Any kind of digital material that you might have
23      reviewed in preparation for this?
24  A.  Not that I can think of, no.
25  Q.  Other than Mr. Lewis here or another attorney, did you

**8**

1       have any conversations with anybody in regards to this
2       deposition today?
3   A.  No, just -- just this gentleman here.
4   Q.  Okay.  And what does Magna do?
5   A.  The division that we're at, Drive Automotive, it's a
6       steel manufacturer, steel stamper, and we produce all
7       types of steel components for various automotive OEMs.
8       Examples are car doors, car hoods, structural
9       components, structural steel components that we ship to
10      companies like BMW, and they weld them together to make
11      the body of the car.
12  Q.  Any other customers?
13  A.  We have BMW, Nissan, Volkswagen, Mercedes, Ford,
14      Chrysler, PACCAR, P-A-C-C-A-R, which is the mother
15      company over Peterbilts and Kenworth trucks, and we
16      also do Freightliner.
17  Q.  And these are some that are just continuously coming
18      through your production facility?
19  A.  Typically, most programs in automotive are seven-year
20      lifecycles.  Heavy truck, which is the PACCAR and
21      Freightliner, is anywhere between 10 to 20 years, and
22      then they give the vehicle a facelift and we re-quote
23      for the next business.
24  Q.  In that facility do you have a largest customer?
25  A.  The majority of our business, probably 60 to 65 percent

**9**

1       is BMW.  The next largest is PACCAR.
2   Q.  How many different automotive suppliers are there as
3       large as Magna?  Do you know?
4   A.  As large as Magna that deal in the steel stamping
5       business that we talk about, there is a small handful.
6       Gestamp, which has a facility in Union, South Carolina,
7       but their home is in Germany.  Another one is Tower
8       Automotive, which is just opening a facility in
9       Travelers Rest near Gray Court.  They're based in
10      Michigan.  And then there's a couple other smaller
11      suppliers, but for the most part, our size, there's a
12      few big competitors, two or three, and that's about it.
13  Q.  Is it fair to say that Magna is the leading supplier
14      for the steel stamping business?
15  A.  I would like to think so, but there are two close
16      competitors.
17  Q.  How long have you been employed by Magna?
18  A.  Magna as a whole, I started in 2004.  I'm Canadian.  I
19      worked in several plants in Canada, southern Ontario,
20      and I transferred down here to Greenville six and a
21      half years ago, July of 2010.
22  Q.  And is this job, the assistant general manager, the
23      only job that you've had at the local facility?
24  A.  No.  I started as a supervisor and then became a
25      manager.  I was a manager in several different

3  (Pages 6 to 9)

## Deposition of Angus Alexander Cruickshank

**10**

1      departments. And as of July 1, 2015, if my year is
2      correct, I took the position as a GM over assembly.
3  Q.  Okay. Back before you became the GM you had this
4      manager position. Is that correct?
5  A.  Yes.
6  Q.  How long did you have that position?
7  A.  I held three different manager positions at Drive
8      Automotive from January 1, 2011 until that date. The
9      last position was production manager over BMW
10     structures.
11  Q.  What is the manager position's responsibility?
12  A.  You're responsible for throughput quality, safety,
13     several KPIs. Those are three big ones. Safety,
14     quality, throughput.
15  Q.  How many employees are currently under your management?
16  A.  Currently under my management I am around five to 600.
17     Some of them are temporary employees and some are full-
18     time. I don't know the exact mix, but percentagewise,
19     30-ish to 40 percent would be temp labor.
20  Q.  And when you were manager, how many employees would you
21     have had?
22  A.  I was around 130, I believe, maybe at some points up to
23     150.
24  Q.  And as supervisor what would you have had?
25  A.  I would have had about 30 to 50 depending on the time

**11**

1     span.
2  Q.  I want to talk about the hierarchical structure --
3  A.  Yeah, sure.
4  Q.  -- the corporate structure there. Let's start where
5     your, I assume assembly person, is that the lower level
6     of the production jobs?
7  A.  What we call the first level is the assembly associate,
8     and they're a production associate.
9  Q.  And then what's next?
10  A.  After that would be a production team leader.
11  Q.  Team leader, okay. And then what's next?
12  A.  They report to the production supervisor.
13  Q.  And then what's next?
14  A.  Production manager.
15  Q.  Then after that is?
16  A.  It would be myself, the assistant general manager.
17  Q.  Let's describe that production floor there at Magna.
18     Just tell me, how large is it?
19  A.  The current plant, we just finished an expansion.
20     We're around 1.2 million square feet. That's the
21     entire plant, all facets, all areas.
22  Q.  Is it in multiple buildings?
23  A.  No. It's all under one roof.
24  Q.  You said you just finished an expansion. So back in
25     July of 2015 to May of 2016, do you know---

**12**

1  A.  We might have just been under the one million mark. We
2     did two expansions in the last few recent years. I
3     cannot remember the last expansion, whether it was
4     during that date, before that date, or after.
5  Q.  Okay. How many production lines are there?
6  A.  In assembly there is high forties to low fifties.
7  Q.  Let's go back to the July 2015 to May 2016 time period.
8     How many production lines would there have been then?
9  A.  Mid forties. Let's say 45. I can't be exact without
10     having to do some research.
11  Q.  Are these production lines doing a variety of different
12     parts, I assume?
13  A.  Yeah. They vary from one-person cells where a person
14     is standing loading a single part to multiple cell --
15     multiple people on a cell where they'd be producing
16     something as complex as a complete hood or a complete
17     door.
18  Q.  Is the equipment that they're using sometimes small and
19     sometimes larger?
20  A.  For the most part it is small. It's cut to an
21     ergonomic standard. I'm trying to think. For the most
22     part they're loading a steel component into a fixture,
23     and then some areas they put a small nut or a stud on
24     that's welded on. All the welding is done by
25     machinery. Other areas they are simply loading a steel

**13**

1     component into a fixture, leaving the cell, and a robot
2     comes in, grabs that component, does various things to
3     it.
4  Q.  Do you ever measure the output of these production
5     lines in terms of dollars or production?
6  A.  Throughput is monitored daily and shift by shift.
7  Q.  How is throughput measured? What's the measurement for
8     that?
9  A.  The throughput is basically we call it OA, operational
10     availability, and that is measured against how many
11     parts you produced versus engineered cycle time.
12  Q.  Do you know the dollar throughput or the throughput
13     measured in dollars for the plant?
14  A.  No, we don't look at that. The engineered throughput
15     in dollar value, we know what our forecasted sales are.
16     To an engineered aspect, I don't -- if you're asking
17     what our forecasted sales are versus what's engineered,
18     I don't know.
19  Q.  What are the forecasted sales?
20  A.  Am I allowed to say that?
21  MR. LEWIS:
22     I don't object. I don't know that it's relevant.
23  EXAMINATION RESUMED BY MR. GUEST:
24  A.  We tend to keep that very confidential.
25  Q.  Is it just in the millions of dollars?

4 (Pages 10 to 13)

LEGAL EAGLE
864-298-0082

Case 3:25-cv-00681-MOC-DCK    Document 27-6    Filed 10/03/25    Page 19 of 27

## Deposition of Angus Alexander Cruickshank

**14**

1  A.  Yes.
2  Q.  Okay.  Let's talk about you mentioned some of the
3     objectives for production in terms of throughput.
4  A.  Yeah.
5  Q.  And quality, that's another one?
6  A.  Yes.
7  Q.  Are some of your customers working on a just-in-time
8     basis?
9  A.  Typically with us we carry anywhere between one to
10     seven days of material on-hand.  Our business is a
11     little different than the typical just-in-time.  Just-
12     in-time works for companies that do items like seating,
13     items that are sequenced with the vehicles that go down
14     the line.  You order a vehicle with tan leather and tan
15     interior.  That is sequenced, and that's typically when
16     they talk just-in-time.  Our components are on every
17     vehicle.  There's no differentiation between a hood.
18     When you order an X5, most of the components we sell go
19     on every X5.  Where in a just-in-time world, they
20     typically only keep a couple hours ahead, and that is
21     sequenced with the customer.  So the 56th car in line
22     at BMW has tan interior.  They just-in-time that.
23  Q.  Are there times where you are concerned about the
24     production needs of a particular customer in regards to
25     your available inventory?

**15**

1  A.  We monitor inventories daily.  From my level we look at
2     it twice daily to ensure and prioritize where we need
3     to move people and — and maintenance staff, you know,
4     at critical areas versus noncritical.
5  Q.  Are there times where there might be an issue with
6     quality where a production line for a customer might
7     come in jeopardy as far as being shut down?
8  A.  There are times throughout the year where we get very
9     tight on deliveries with the customer.  Sometimes it is
10     related to quality.  Typically, if we have a quality
11     issue at the customer, we do a hold on material, and
12     then we have staff that goes through and sorts the
13     material.  They ensure that whatever quality issue
14     showed up at the customer we have clean certified stock
15     at our facility.  Anything that they find that is
16     suspect or bad quality we disposition out of our
17     system.
18  Q.  And sometimes it may affect the production of a
19     customer?
20  A.  There's always a risk that we affect them.  I'm trying
21     to think in the recent past have we ever shut them
22     down.  We have only ever shut them down for weather and
23     trucking issues.  Sometimes a truck shows up -- I'm
24     trying to think – 20 minutes late and BMW has had to
25     shut down a small cell for 20 minutes while we're

**16**

1     waiting for that product.  You know, frequency of how
2     often that happens, I would say in the past few years,
3     you know, maybe six times a year, maybe three times a
4     year.  Do I have specific data on that?  No.  I'm
5     trying to remember when the last time we did it.  I
6     think we're going way back into last year sometime.
7  Q.  And what are the consequences from the customer to
8     Magna?
9  A.  It's a financial penalty.  Basically, depending on what
10     line of theirs we shut down, they have set financial
11     penalties to basically cover their loss of production.
12  Q.  If that were to occur, I assume then that's a topic of
13     conversation on the production floor?
14  A.  Sure, yeah.  Definitely, yeah.
15  Q.  Back in July of 2015, how many supervisors were there?
16  A.  I'd have to look through some old documents to see, but
17     I'm going to say roughly somewhere between 12 to 15 in
18     assembly.
19  Q.  Is that across all shifts?
20  A.  Yes.
21  Q.  So there would be roughly five on each shift?
22  A.  Sure, yes.  Yeah.
23  Q.  I don't want to answer for you if that's not correct.
24  A.  Well, we typically try to stick to a goal of 12 people
25     per leader.  Now, a leader can be defined as a team

**17**

1     leader or a supervisor.  In the recent past in
2     assembly, typically every supervisor has two team
3     leaders working under them.  Right now we sit around 32
4     to 35 associates per supervisor.  So the directive that
5     we get from Magna at 8 to 10 people per leader,
6     basically we stick in that -- that frame.
7  Q.  And that would be consistent you said now, but that
8     would also be consistent with what you would expect
9     back in July of 2015?
10  A.  For the most part, yes.  I think in all my years at
11     Magna, the most I've ever seen under one supervisor
12     would be maybe 40 to 45 people.
13  Q.  You were a supervisor for a period of time?
14  A.  Yes.
15  Q.  How many did you—
16  A.  I was supervisor in our press shop, and I would have
17     probably had 25 to 35 associates, around that number.
18  Q.  Okay.  I'm trying to get an idea for what the square
19     footage would have been for a particular supervisor as
20     far as what they had to monitor.  Can you help me with
21     that?
22  A.  Square footage of assembly, I'm trying to think exact
23     numbers right now, and back then in 2015 probably would
24     be sitting around somewhere 400,000, potentially
25     500,000 square feet.

5  (Pages 14 to 17)

## Deposition of Angus Alexander Cruickshank

**18**

1 Q. And would a supervisor be roaming all of that?
2 A. They would have certain areas that they're responsible
3    for. We break it into for the most part kind of
4    customers, value stream. At the time, BMW structures,
5    which Sonji reported to, would have been spread over a
6    large portion of that 400 to 500,000 square feet. To
7    give exact areas, it would be kind of hard to say. I
8    think she would be intermingled or a supervisor would
9    be intermingled with other supervisors. Sometimes they
10   have to go around certain areas to get to some of the
11   cells they're responsible for, but I would say maybe
12   200,000 square feet would be a general roaming area.
13 Q. Okay, thank you. As a manager and then so -- well,
14   let's stick to just the manager job for a moment. Your
15   job was to communicate with the supervisors. Is that
16   correct?
17 A. Correct.
18 Q. I assume also, if you had to, you would dive down into
19   the details?
20 A. It's an open-door facility, yeah. Today I had
21   associates asking me about vacations for Christmas. So
22   it's all levels, yeah.
23 Q. Okay. So in your communications with the supervisors,
24   how would you communicate? How do you communicate with
25   them?

**19**

1 A. I was on a straight day shift role at the time. For
2   the most part when we were on three shifts, I see some
3   of the night shift staff as they're leaving. The day
4   shift staff obviously are there, I work with for the
5   most part. And there's an afternoon shift. I would
6   see them when they come in at two o'clock.
7   Communication can vary from e-mails to face-to-face to
8   radio communication, that type of thing.
9 Q. Do you ever use your mobile phones to call?
10 A. Yeah, we do call each other. That's sometimes done.
11   And I'm trying to think. That can happen. That does
12   happen.
13 Q. Do you use mobile phones for purposes of texting and
14   communicating?
15 A. Yeah. We do text, yeah.
16 Q. And I assume this is related to the job in the
17   production facility.
18 A. Yes. Yeah.
19 Q. How does Magna keep attendance?
20 A. We use an ADP attendance system. That is for the
21   associates and the team leader level. Supervisors are
22   typically salaried, and when they work overtime there's
23   the punch clocks for the ADP. I think most salaried
24   supervisors use the punch clocks and the ADP system.
25 Q. So they're coming in and just using a swiping or---

**20**

1 A. Yeah. Swipe, punch in a code, and it's entered into
2   the system. At the end of the week the next level of
3   leadership basically has to approve the payroll before
4   payroll takes it.
5 Q. Let me ask you, if there was concern about a person's
6   attendance, would we find that in the personnel file
7   for that person?
8 A. It should be in the HR personnel file. Typically we
9   have a point system at Drive. It's a seven-point
10   system, and between HR -- and I believe in 2015 HR was
11   the ones monitoring attendance. The HR coordinator for
12   the area would send an e-mail to the supervisor or the
13   manager depending on what level and say that this
14   associate is at X number of points, this stage in the
15   progressive discipline, and basically that's where it
16   would be.
17 Q. Is that a particular form that's filled out?
18 A. Sometimes it is a formal form depending on the history
19   in the last few years and where HR wants to take it.
20   At one point in time, it was a formal signed-off form.
21   At other points in time, it has just been a verbal.
22   Associate Jim, for example, you're at four points, just
23   so you're aware, you have three more points until
24   termination. And there's a guideline for points in our
25   employee handbook that's related to whatever various

**21**

1   infractions happen with your time and your punching in.
2 Q. If there are concerns about an employee's performance
3   other than you just described attendance --
4 A. Yeah.
5 Q. -- regards to other issues related to their
6   performance, how is that dealt with?
7 A. There is a progressive discipline system at Drive that
8   is laid out in the employee handbook. Typically it's
9   five steps of progressive discipline. Things can vary
10   from -- in the employee handbook, it lays it all out --
11   you know, a minor falsifying documentation to what we
12   call lock-out/tag-out violations, which is a safety
13   infraction. And we also lay out that sometimes steps
14   can be jumped dependent on severity of the infraction,
15   but typically there's five steps to termination.
16 Q. If a person has an issue with their performance -- this
17   is a similar question to attendance, but I just want to
18   make sure that we're addressing it. It would also be
19   something we would find in their personnel file?
20 A. Yes. Yeah, it should all be in there.
21 Q. Are those addressed quickly?
22 A. Sometimes it takes a few days to do investigation. I
23   have an example right now. An associate, we're onward
24   of four or five days just simply getting all the
25   documentation ready and making sure that we're doing

6 (Pages 18 to 21)

LEGAL EAGLE
864-298-0082

Deposition of Angus Alexander Cruickshank

**22**

1    the right step in the next discipline.
2   Q.   But outside of that it would---
3   A.   It can be addressed typically within the first 24 to 48
4    hours.
5   Q.   Okay. And I haven't asked this question, but we are
6    here about a claim that Sonji McKinney has filed for
7    workers' comp benefits. Are you aware of that?
8   A.   Yes.
9   Q.   And do you know Sonji McKinney?
10   A.   Yes.
11   Q.   And how do you know her?
12   A.   Sonji worked for me when I was manager of the area.
13    Sonji started -- I first believe I met her when she was
14    a team leader, and she was promoted into a supervisor,
15    and I think supervisor level was where -- the last I
16    saw you.
17 MS. MCKINNEY:
18    Yeah.
19 EXAMINATION RESUMED BY MR. GUEST:
20   Q.   So you're aware of her job promotions while she was
21    there?
22   A.   Yes. I was part of it.
23 MS. MCKINNEY:
24    Yeah. That's the best boss.
25 EXAMINATION RESUMED BY MR. GUEST:

**23**

1   Q.   During the course of this deposition we have to allow
2    you to actually answer the questions.
3   A.   I understand.
4   Q.   All right. When she moved from, I think you just said
5    a team leader to a supervisor, were you supportive of
6    that move?
7   A.   Very much. Sonji was a high-potential team leader,
8    high-performing. I was very happy with her skills, the
9    way she approached people, dealt with difficult
10    situations and difficult people, dealt with difficult
11    situations technically, meaning organizationally.
12   Q.   Were you aware of any physical or health reasons why
13    she could not perform the supervisor role?
14   A.   No. You know, obviously there was the accident, but
15    prior to that she was very healthy and able to perform.
16   Q.   I'm going to show you this document right here. I
17    think you'll be familiar with it.
18 MR. GUEST:
19    I'm going to mark it as Claimant's Number 1.
20 MR. LEWIS:
21    What is it? Okay.
22 (Plaintiff's Exhibit Number 1 marked)
23 EXAMINATION RESUMED BY MR. GUEST:
24   Q.   Can you describe what Claimant's Number 1 is?
25   A.   It's the job description for assembly production

**24**

1    supervisor. That was prepared 9/11/2014.
2   Q.   By who?
3   A.   By myself.
4   Q.   I want to ask you generally about this. You mentioned
5    several qualities that Sonji had in regards to
6    performing the supervisor role. Did you feel like she
7    was able to meet the responsibilities that you were
8    describing in this particular document?
9   A.   Yes, very much so.
10   Q.   And I'm looking also at the third page when it talks
11    about the physical demands in the work environment. It
12    says manufacturing environment, 90 percent standing and
13    walking, 10 percent lifting. Is that an accurate
14    description of the physical requirements?
15   A.   Yes, I believe so, yeah.
16   Q.   You can hold onto that for a moment. So let's talk
17    about the time when Sonji became supervisor. How many
18    different production lines would she have had
19    responsibility for?
20   A.   She, I believe -- and I may be wrong -- was the
21    production supervisor on second shift over BMW
22    structures. If I can think at the time and give an
23    approximate number, I'm going to say 25 to 30 cells.
24    The majority of those cells are single-person cells in
25    that area. There's only a few, a handful of cells that

**25**

1    have multiple people in them.
2   Q.   This would suggest then that she's got direct reports
3    somewhere between 25 to 35?
4   A.   She would have had -- and I would have to verify it
5    with old org charts -- two team leaders and anywhere
6    from 25 to 35 associates.
7   Q.   I think you said at that time there was roughly 500
8    employees. Would that be correct?
9   A.   In the entire plant we would be, with all of the
10    indirect labor and salaried staff, I'm going to say
11    between 1100 to potentially 1300.
12   Q.   On the assembly production floor?
13   A.   I'm going to say production associates, the assembly
14    floor would most likely be around three to 350,
15    approximately, around that -- that time frame.
16   Q.   You as a supervisor came from outside the plant and
17    came directly there as a supervisor?
18   A.   Yes.
19   Q.   Is that the normal course of how a person becomes a
20    supervisor there?
21   A.   No. It varies. There are some people that are hired
22    from outside, non-Magna, that are hired as supervisors.
23    There are people like myself who transferred from other
24    plants as an intercompany transfer to become
25    supervisors. There are some people that grow up inside

7 (Pages 22 to 25)

LEGAL EAGLE
864-298-0082

Deposition of Angus Alexander Cruickshank

**26**

1    of Drive specifically and work their way into
2    supervisor positions.
3    Q.  So, as I understand it, that supervisor job is one with
4        extreme responsibility.  Would you agree with that?
5    A.  Very much so.
6    Q.  It has high compensation.  Is that correct?
7    A.  For comparison to the industry in the area, yes.
8    Q.  The people that you would promote would only be people
9        that have the competence and ability to perform those
10       duties.  Is that correct?
11   A.  Correct.
12   Q.  The number of people that we might choose from to
13       actually get that person could be in the thousands, as
14       I understand it?
15   A.  Typically, supervisors are promoted from the team
16       leader level.  Magna has a policy that you must first
17       promote from within your facility.  If there's no one
18       within your facility, then they can look at other
19       facilities posted on a -- we call it the Magna web,
20       intercompany website, and then if there's no candidates
21       found there, then you go out to the -- I guess the
22       general public.
23   Q.  How many supervisors across the shifts are there now,
24       12 to 15?
25   A.  Right now we have 11.

**27**

1    Q.  Eleven?
2    A.  Yeah.
3    Q.  Of those numbers, where did they get promoted from?
4    A.  I'm trying to think.  There is two from outside Drive
5        Automotive, outside of Magna.  There are -- the vast
6        majority of them are team leaders who were promoted
7        upwards.  And then as team leaders, to get to a team
8        leader, they were production associates at one point in
9        time.
10   Q.  So the majority of the supervisors you have now would
11       come from the 350 to 400 that you would have on the
12       floor?
13   A.  Yeah.  Some of them have been supervisors for 10, 10
14       years, maybe some that are upwards of 15 years.  There
15       are some very senior supervisors.
16   Q.  And not everyone would qualify as a supervisor.
17   A.  No, unfortunately.  And there's varying qualifications.
18       I mean, we don't look for a four-year degree.  It's
19       helpful.  Sometimes we have changed the rule to require
20       a four-year degree.  Some years we go back, and that is
21       is help us just get a good mix of people, some people
22       that have grown up on the shop floor and have street
23       sense, for lack of a better word, and some people that
24       can balance them off with formal education.
25   Q.  And how would you have classified Sonji in that?

**28**

1    A.  I think she is a person that grew up on the shop floor
2        and has some good solid street sense.
3    Q.  All right.  So let's go to the incident involving a
4        forklift and Sonji.  Are you aware of that?
5    A.  I think I'm aware of it.  As far as the details, I
6        don't have a lot of that.
7    Q.  Do you know that she was hit -- let me describe this to
8        you and see if this is what your understanding is.  Is
9        that she was working and inspecting parts at Kimura?
10   A.  Yes.
11   Q.  Does that sound---
12   A.  Yes, that is what I remember as her accident.
13   Q.  And that at some point she was hit by a forklift that
14       was coming down and out?
15   A.  Yes.
16   Q.  Can you tell me what that role is about going over to
17       Kimura and who Kimura is?
18   A.  Kimura is our 3PL, third-party logistics company.
19       Kimura is also a warehouse where we store a lot of our
20       material, our days-on-hand, to help with floor space.
21       And the production floor is typically small components,
22       which the area that Sonji worked in created a lot of
23       small components.  They require a lot of floor space.
24       So typically we go to an outside warehouse that's close
25       to our area and we store the parts there.  When quality

**29**

1    alerts happen, an issue happens, we block parts in our
2    entire value stream which includes the warehouse.  So
3    in order for them to be inspected and prepared for
4    shipping, sometimes we have to send our leadership and
5    our people to the warehouse to inspect and sort and
6    then release in our electronic system so they can be
7    shipped.
8    Q.  What type of people would you send over there to the
9        warehouse?
10   A.  Typically, we have associates.  Sometimes we bump it up
11       to a team leader and supervisor level if it is a
12       critical -- critical sort.  And what defines a critical
13       sort, sometimes it's timing, we need to make shipment
14       to a customer.  Sometimes it can be a safety critical
15       component.  We manufacture the connections for seat
16       belts that go in your car.  Sometimes we don't trust
17       that an associate understands the -- the complexity,
18       the severity if a bad part got through to the customer,
19       because they can drive recalls and so on.
20   Q.  So if a supervisor is going over there to inspect, does
21       that mean that it's a more critical sort?
22   A.  Sometimes yes.  Sometimes we send supervisors and team
23       leaders there just to check up and make sure that the
24       associates are doing the sort as per required.
25   Q.  And you would send them because of their knowledge and

8  (Pages 26 to 29)

LEGAL EAGLE
864-298-0082

Deposition of Angus Alexander Cruickshank

**30**

1      experience?
2   A.   Knowledge, experience, and their level of leadership.
3   Q.   I think you used the word trust earlier. Is that true?
4   A.   Yes, definitely.
5   Q.   That you would trust them?
6   A.   Yeah.
7   Q.   In Sonji's time with Magna, did she help meet the
8      production objectives of Magna?
9   A.   Definitely, yeah.
10   Q.   Did you find her to be conscientious?
11   A.   Yes, very much so.
12   Q.   Was she prior to the accident hard-working?
13   A.   Yes, very much.
14   Q.   Was she dedicated to the effort?
15   A.   Yes.
16   Q.   And did you trust her?
17   A.   Yes.
18   Q.   Was a person you could rely on?
19   A.   Yes,
20   Q.   Did you find her to be a credible person?
21   A.   Yes.
22   Q.   Prior to the forklift accident, did you find her to
23      have difficulties performing her job?
24   A.   No. She was a very high performer.
25   Q.   Did you have to deal with disciplinary actions in

**31**

1      regards to Sonji that you can recall prior to the
2      forklift accident?
3   A.   Not that I recall. There may have been coaching
4      opportunities just to increase performance, or, you
5      know, we all have traits that we need to better
6      ourselves, but for the most part it was very positive.
7   Q.   After this forklift accident do you know what her job
8      duties were?
9   A.   They remained the same. I seem to remember there was a
10      portion of time where she was on light duty. I don't
11      know how long that lasted, and it may very well have
12      lasted right up to the last few weeks that she was
13      there.
14   Q.   Can you describe to us what light duty was?
15   A.   Depending on the person and what their incident is at
16      Drive, we put them on -- we call it a generic term --
17      light duty. Some people have a walking restriction.
18      Some people have a kneeling restriction, a lifting
19      restriction, I can't use my right arm, and we try to
20      find work that is suitable to that. We also try to
21      keep them to a 40-hour work week with no overtime.
22   Q.   Now, she as a supervisor would still be required to
23      monitor and manage that same 200,000 square feet?
24   A.   Yes.
25   Q.   And I assume that that would mean that she would have

**32**

1      to be out and about on the floor?
2   A.   Yes.
3   Q.   And as much as that 90 percent of the time?
4   A.   Yes.
5   Q.   Do you know if the light duty description of what job
6      you had available for her was ever put in writing?
7   A.   That I don't know, to be honest. We might be able to
8      find it in her personnel files.
9   Q.   Did you know her to have suffered some injuries as a
10      result of the accident?
11   A.   Yes.
12   Q.   Do you know if she continued to try to work through
13      those injuries?
14   A.   Very much so, and we tried very hard to support her. I
15      believe her restrictions were the amount of time she
16      could spend on her feet. We purchased an electric cart
17      to help her with her mobility, and I even remember to
18      the point where it was a dedicated cart for her and I
19      would have to argue and make sure that the other shifts
20      returned it fully charged for when she came in, and
21      since then we've actually implemented these carts in a
22      lot of areas because there is a lot of walking. And,
23      but Sonji at one point in time, and I don't know when
24      during her -- after her accident we did supply her with
25      a cart.

**33**

1   Q.   And what would that look like in terms of use of the
2      cart for a person during the day?
3   A.   Basically, what it does is it allows the supervisors
4      and team leaders the ability not to have to walk all
5      these distances. It's a smaller three-wheeled cart.
6      It's a one-seater that can convert into two seats. It
7      allows them to get into the tight little areas, drive
8      around, carry any kind of things from our on-site store
9      to the line if they had anything. If they're in one
10      area and they need to go to another area and they get a
11      call on the radio, it's the ability for them to drive
12      over instead of have to walk the great distances.
13   Q.   And was she required to get off to inspect a part, to
14      talk to somebody?
15   A.   Yeah. I think the expectation is that you drove over
16      to the area. If you needed to, you stand up off the
17      cart and, you know, walk short distances, look at the
18      situation, understand what's going on, and, you know,
19      you can use the cart, and as -- you can sit on the cart
20      as long as you want. There's no specification there,
21      but there are some places where it just doesn't fit in
22      for them. There is some walking.
23   Q.   I assume that there's also some inspection of a part
24      that just requires you to move off the cart to move to
25      that particular part to inspect it?

9 (Pages 30 to 33)

Case 3:25-cv-00681-MOC-DCK     Document 27-5     Filed 10/03/25     Page 24 of 27

Deposition of Angus Alexander Cruickshank

**34**

1  A. Yes, that's correct.
2  Q. And that would be part of the supervisor's role?
3  A. Yes. Yeah.
4  Q. And was it a 12-hour workday?
5  A. To be honest, I cannot remember if we were on 12-hour
6     shifts at that point in time or 8-hour shifts. I do
7     remember Sonji moving from second shift, our afternoon
8     shift to day shift, and that was some point in time
9     after the accident, but I don't -- I don't recall them
10    being on 12-hour shifts at that point in time.
11 Q. Do you know if she was ever given a sedentary job?
12 A. There may have been. I remember we implemented stools.
13    We had sit-down desks. We moved to a stand-up table
14    for their desktop computers for supervisors. We did
15    bring stools in and allowed people to sit when they
16    were working on the computer so they didn't have to
17    stand all the time. The exact time frame for when
18    Sonji was there, I don't have the details of that.
19 Q. Now, when I mean sedentary, that she was not required
20    to move around the shop floor.
21 A. For the entire day I would -- I would doubt there was
22    ever a time where she wasn't required to move around.
23    She would -- you know, in an 8-hour or 9-hour day,
24    there would be some need to move. It was not a desk
25    job.

**35**

1  Q. Do you know Debra Vronch?
2  A. Yes.
3  Q. And who was she?
4  A. Debra was a supervisor under me. At that point in
5     time, Debra worked first shift, a highly competent
6     supervisor. She had been hired from the outside about
7     five or six years prior. Her life span at Magna was
8     about -- or at Drive was five to six years. Since now,
9     recently, last summer she moved back to Michigan.
10 Q. Do you know why she moved?
11 A. To be closer to her grandchildren. She stayed in Magna
12    and worked in a Magna facility up there.
13 Q. I'm going to share with you something.
14 A. Okay.
15 MR. GUEST:
16        I'd like to mark this as Claimant's Number 2,
17 (Plaintiff's Exhibit Number 2 marked)
18 EXAMINATION RESUMED BY MR. GUEST:
19 Q. Angus, if you could, would you describe what you see as
20    Claimant's Number 2?
21 A. What I see is an e-mail from Deb Vronch to several of
22    the supervisors at the time, and she is talking about
23    the supervisor expectations to be on the floor 90
24    percent of the time, at the computer 10 percent of the
25    time. She expects them to walk or ride every line,

**36**

1     make sure the operators are doing and performing their
2     quality checks correctly, audit the process in hourly
3     checks. So those are hourly quality checks that are
4     performed. When you see -- when they see you looking,
5     if they care, they will do the process correctly. If
6     not, we will get someone who will. And my belief in
7     that statement is we have a long time saying, "if you
8     inspect what you expect, you will get what you want."
9     So that's sort of a way of putting that. Supervisors
10    are to inspect that the associates are performing their
11    quality checks and -- and making good product.
12 Q. And when it says make sure the operators are using
13    checks correctly, how would a supervisor do that?
14 A. Sometimes it's as simple as checking documentation,
15    making sure they've done their various quality checks.
16    Other times it could be putting a part on a check
17    fixture. Some lines we have check fixtures that check
18    different attributes of the part. And we ask the
19    production associates to do that on a frequency
20    depending on the line and the part, and sometimes we
21    ask team leaders and supervisors to perform that, to do
22    a double-check and make sure that the associates are
23    doing their job.
24 Q. And would Sonji be able to do that particular
25    requirement or other requirements that you see there

**37**

1     from sitting on her cart?
2  A. Probably 90 percent of the time, no. She probably
3     would have to get up and get to an area where she could
4     get to the check fixture, get to the parts. Most of
5     them would not be accessible by the cart.
6  Q. Let me ask about the tone of the particular e-mail. I
7     see at the bottom it says, "Alerts area getting out of
8     control fast." Did I read that correctly?
9  A. Yes.
10 Q. There's another statement that says, "I am getting
11    hammered by alerts going out to the customer."
12    "Everyone -- the word everyone is in capital letters --
13    will check alerts and work instructions daily." How
14    would you describe the tone of this particular e-mail?
15 A. To me when I read this, I would believe that some of
16    the supervisors were not doing their due diligence on
17    following up and making sure associates were doing
18    their job. I would consider this a blanket statement
19    to the supervisors saying you need to do your job and
20    make sure they are performing their checks. It is part
21    of the supervisor's responsibility to make sure the
22    checks are being performed.
23 Q. So would it be characterized as a stern message to
24    them?
25 A. I believe so, yes.

**10 (Pages 34 to 37)**

LEGAL EAGLE
864-298-0082

Deposition of Angus Alexander Cruickshank

**38**

1   Q.   And the date that this was sent, is it correct that it
2        was on Monday, March 14?
3   A.   I would say by the e-mail. I couldn't challenge that,
4        yeah.
5   Q.   March 14, 2016?
6   A.   It says that on the e-mail, that's correct.
7   Q.   You don't have any reason to doubt that date?
8   A.   No, not right now, no.
9   Q.   I'll show you another e-mail.
10  A.   Okay.
11  MR. GUEST:
12       Without objection I'll mark it as Claimant's
13       Number 3?
14  MR. LEWIS:
15       Yeah. No objection.
16  (Plaintiff's Exhibit Number 3 marked)
17  EXAMINATION RESUMED BY MR. GUEST:
18  Q.   Angus, I'll present to you that the name at the very
19       top there is just my paralegal where we got this e-mail
20       from Sonji. So the rest of it, can you identify what
21       the rest of it is?
22  A.   It looks like a conversation through e-mail between
23       Debra Vronch and Sonji McKinney referring to Sonji's
24       light duty and them trying to discuss what to do, how
25       do we meet Sonji's needs with her swelling legs and

**39**

1        having pain constantly with the needs of the 90/10
2        split between on the floor and at the desk.
3   Q.   In your experience with Sonji, is she someone who would
4        try to avoid work?
5   A.   No.
6   Q.   Or dodge work?
7   A.   No.
8   Q.   When she says, "With the swelling in both my legs, also
9        the pain I constantly have, it would be hard for me to
10       perform that request," do you have any reason to doubt
11       that statement by her?
12  A.   No.
13  Q.   In Debra Vronch's reply was there a different job that
14       was offered to her other than the 90/10 on the assembly
15       floor?
16  A.   I don't know if there was a different job offered. I
17       can say that I don't think there was. We did bring
18       Sonji to first shift where there was two supervisors in
19       the area to help reduce the amount of pressure to move
20       around, and typically we keep two supervisors on first
21       shift to help work on projects. So the off-shift
22       supervisors have a lot more of continuing to push
23       throughput, and that versus day shift typically we can
24       split up the responsibilities.
25  Q.   Other than that accommodation, though, the job would

**40**

1        still have required the 90/10?
2   A.   Correct.
3   Q.   And the date of this e-mail is said to be April 26,
4        2016. Do you have any reason to doubt that date?
5   A.   No.
6   Q.   Do you have an understanding of what Sonji's current
7        health condition is?
8   A.   Believe it or not, no, I don't. I have been asking
9        since she left how things were of our HR department,
10       and I was never given an update. So I up until last
11       week -- we're doing some reorganization -- I still had
12       her on my org chart as a supervisor. So, you know, as
13       of last week with a year to come here, I've taken her
14       off the list as part of my head count.
15  Q.   You know that her treating doctors have said that she's
16       experiencing chronic pain caused by the forklift
17       collision?
18  A.   Sonji had told me that, yeah.
19  Q.   Do you have any reason to doubt that's true?
20  MR. LEWIS:
21       I object. Objection. You can go ahead and
22       answer.
23  EXAMINATION RESUMED BY MR. GUEST:
24  Q.   Do you have any specific facts or evidence that would
25       tend to show that that's not true?

**41**

1   A.   No, I don't.
2   Q.   I'm not asking you to state a medical opinion.
3   A.   I understand.
4   Q.   Do you know that Sonji has been diagnosed with a major
5        depressive episode due to her chronic pain from the
6        forklift injuries?
7   A.   No, I don't.
8   Q.   Do you have any specific facts or evidence that you
9        would know that would tend to dispute that?
10  MR. LEWIS:
11       Objection. I don't think he's qualified to answer
12       that. You can answer subject to the objection.
13  MR. GUEST:
14       I think he's qualified to answer whether he has
15       any facts or personal experience with her that would---
16  EXAMINATION RESUMED BY MR. GUEST:
17  A.   No, I don't.
18  Q.   Did you know that there's an attempt right now to deny
19       her psych treatment? Did you know that?
20  A.   No, I don't.
21  Q.   Did you know that there's an attempt to terminate her
22       weekly benefits and make her pay dollars back to them?
23  A.   No, I don't.
24  Q.   What evidence or facts would you know that would
25       support that effort that I just described to you to

11 (Pages 38 to 41)

LEGAL EAGLE
864-298-0082

Deposition of Angus Alexander Cruickshank

**42**

1     deny those benefits?
2     A. I'm not quite sure I understand.
3     Q. So I'll break it down. They're wanting to deny psych
4        treatment for her. Do you know any facts or evidence
5        that you would have in your possession that would
6        support their decision?
7     A. No.
8     Q. In regards to terminating her weekly benefits, do you
9        know of any facts or evidence that would tend to
10        support that?
11     A. No, I don't.
12     Q. After we've gone through this list of questions and
13        answers, I just want to make sure that you still have
14        the opinion that what you know about Sonji you would
15        trust her?
16     A. Yes.
17     Q. And find her to be a credible person?
18     A. Yes.
19     Q. One second. I might be done, but I need to talk to
20        Sonji.
21     (Off the Record; 11:08 -- 11:10 a.m.)
22     MR. LEWIS:
23        I don't have anything.
24     (There being no further questions, this deposition concluded
25     at 11:10 a.m.)

**43**

1          CERTIFICATE OF REPORTER
2
3       I, Rosalind Poole Walters, a Notary Public in and for
4    the State of South Carolina, do hereby certify that the
5    foregoing 42 pages represents a true and accurate transcript
6    of the deposition of ANGUS ALEXANDER CRUICKSHANK, which was
7    taken by me on the 1st day of February, 2017.
8       That the witness was first duly sworn to tell the
9    Truth, the whole truth and nothing but the truth of his own
10   knowledge concerning this matter.
11      That I am not related to nor the employee of any of the
12   parties hereto, nor related to or employed by any attorney
13   or counsel employed by the parties hereto, nor interested in
14   the outcome of this action.
15
16
17        ROSALIND POOLE WALTERS, CVR-M
18        Notary Public for South Carolina
19        Commission expires: 4/29/26
20
21
22
23
24
25

12 (Pages 42 to 43)

LEGAL EAGLE
864-298-0082

244 / 244

